# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 75739-3-I |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| BURRELL MICHAEL CUSHMAN, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 25, 2018 |
| | ) | |

DWYER, J. — Burrell Cushman appeals from the judgment and sentence entered on a jury's verdicts convicting him of one count of murder in the second degree and one count of felony violation of a no-contact order. He contends that the trial court erred by admitting testimony of his prior acts of domestic violence against the murder victim, that he received ineffective assistance of counsel because his lawyer at trial did not impeach a State witness with a nearly decade-old misdemeanor theft conviction and did not argue at sentencing an inspired theory of same criminal conduct, and that the prosecutor's rebuttal argument in closing deprived him of his right to a fair trial. Concluding that there was no error, we affirm.[1]

---

[1] Cushman also submits a pro se statement of additional grounds setting forth an ineffective assistance of counsel argument that does not merit appellate relief.

I

This matter arises from the murder of Amy Hargrove and the criminal prosecution of Cushman. In 2008, Cushman and Hargrove began dating and, in 2010, they had a child together. In the months following their child's birth, however, Cushman was seen engaging in several menacing and threatening acts toward Hargrove.

According to Jennifer Hallman, a coworker and close friend of Hargrove, Cushman had on at least two occasions appeared at Hargrove's workplace upset and intoxicated. While there, he "would yell and scream at [Hargrove], would threaten her, [and] would verbally abuse her." In response to Cushman's aggressive conduct, Hargrove and Hallman would lock themselves in a room and request that the building's security remove him from the premises. On one such occasion, Cushman threatened Hargrove, "If you try and take my kid from me, I will fucking kill you."

Hallman also recalled an incident in 2011 when Cushman and Hargrove visited her house after work. Hallman stated that Cushman had become "very upset about a very small reason," and picked up a "very large vase," aimed it at Hargrove's head, and threw it at her. The vase did not make contact with Hargrove.

Hargrove ended her relationship with Cushman in 2011.

By 2012, Hargrove and the child that she conceived with Cushman were living in the home of her mother, Janet Ford. Ford recalled that, after Hargrove terminated her relationship with Cushman, Cushman nevertheless visited

- 2 -

Hargrove at Ford's home. On one such occasion, Ford overheard heated argument between Cushman and Hargrove followed by a "loud thud" and the sound of Hargrove screaming. When Ford located Hargrove, she was crying and covering her face and one of her eyes was red. Ford believed that Cushman had punched Hargrove in the face. She ordered Cushman out of her home and indicated that she would never allow him back into her home.

Shortly thereafter, Hargrove obtained a one-year no-contact order against Cushman, prohibiting him from approaching her or their child. To Ford's knowledge at that time, Hargrove and Cushman had no further interaction with each other.

Hargrove renewed the one-year no-contact order in May 2013. By mid-2013, Hargrove had moved into the mother-in-law unit attached to Ford's home.

Beginning in November 2013, Hargrove and Cushman began to contact each other in an attempt to repair their prior relationship. Hargrove did not tell Ford that she was again seeing Cushman.

On the weekend of January 4, 2014, Hargrove arranged for Paula Cushman, Burrell Cushman's mother, to take care of Hargrove's and Cushman's child for the weekend. Paula picked up the child and also exchanged telephone calls and text messages with Hargrove throughout the weekend until the early afternoon of January 5. After then, Paula received no further communication from Hargrove.

Also during the afternoon of January 5, Paula spoke with Cushman over the telephone. Cushman told her that he and Hargrove had been fighting, that there was some pushing, yelling, and screaming, and that he had a "bad feeling."

The next day, January 6, after Hargrove neither appeared at a family function nor responded to Ford's text messages from the day before, Ford entered the mother-in-law unit attached to her home. There, in the bedroom, she found Hargrove dead.

Hargrove's body was fully clothed, partially covered by blankets, and had been positioned face down on the bed's mattress. Placed over Hargrove's upper torso was a hooded, zippered sweatshirt with the hood's draw string pulled all the way to the end of its length. The cause of Hargrove's death was alleged to be asphyxiation by strangulation and her death was alleged to have occurred during the afternoon of January 5.

Further investigation of the mother-in-law unit uncovered that a burner on the kitchen stove had been left on, that cooking oil had been tossed around the kitchen, and that a space heater had been activated to a high temperature setting and placed underneath the bed where Hargrove's body had been discovered, with a blanket draped over it. Notwithstanding these circumstances, no fire had broken out.

When Paula returned to Hargrove's residence on January 6 and spoke with the law enforcement officers present, she informed them of her telephone conversation with Cushman during the late afternoon of January 5.

At Paula's direction, Cushman contacted law enforcement. He was invited to meet with detectives at the police station. When he accepted the invitation, Cushman was driving in a car accompanied by two of his friends, Bonnie DeMarce and Darryl Jones. DeMarce asked Cushman why he needed to go to the police station. Cushman replied, "It is okay, I did something really stupid. It is okay, I -- I covered it up."

While at the police station, Cushman acknowledged that he was with Hargrove from Saturday, January 4, until Sunday, January 5, around 4:00 p.m. The detectives noticed fresh abrasions and scratches on Cushman's hands and forearms. He was later arrested and held on suspicion of a violation of the no-contact order prohibiting him from having contact with Hargrove.

After further investigation, Cushman was charged with one count of murder in the second degree, one count of attempted arson in the first degree, and one count of felony violation of a no-contact order.

Prior to trial, a hearing occurred to determine whether Hallman's and Ford's testimony regarding their observations of Cushman's domestic violence toward Hargrove between 2009 and 2012 should be admitted. Relying on the State's offer of proof—and over Cushman's objection—the trial court admitted Hallman's and Ford's testimony for the limited purpose of showing Cushman's motive, res gestae, and the nature of Hargrove's and Cushman's relationship.

A 10-day trial commenced. The prosecutor called several witnesses, including Hallman, Ford, and DeMarce. After the State rested its case in chief, defense counsel called Burrell DeBose (Cushman's father) and Patricia Cook

(DeBose's girlfriend) to support Cushman's general denial defense. The defense witnesses testified that, on January 5, Cushman had arrived at DeBose's home before the time at which Hargrove was alleged to have been murdered. Thereafter, the defense rested.

Both parties then presented closing argument, during which no objections were interposed.

The jury later returned verdicts finding Cushman guilty of one count of murder in the second degree and one count of felony violation of a no-contact order. The jury acquitted Cushman of the charged count of attempted arson in the first degree. The jury further found that Cushman and Hargrove were members of the same family or household at the time that the crimes of conviction occurred.

At sentencing, the court determined that Cushman's prior criminal convictions and then-current crimes of conviction warranted an offender score of 5 for sentencing purposes. Defense counsel objected, but acknowledged that his objection was based on policy—rather than legal—grounds. Defense counsel's objection was overruled.

Thereafter, the court imposed a sentence at the top of the standard range. Cushman was ordered to be incarcerated for 275 months for his conviction of second degree murder and, concurrently, 43 months for his conviction of felony violation of a no-contact order.

II

A

Cushman contends that the trial court erred by allowing the State to introduce evidence of his prior verbal and physical abuse of Hargrove—acts occurring nearly two years before her murder—on the basis that his acts were probative of Cushman's motive to kill Hargrove. We disagree.

"Under ER 404(b) evidence of other crimes, wrongs, or acts is presumptively inadmissible to prove character and show action in conformity therewith." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995) (citing ER 404(b); Carson v. Fine, 123 Wn.2d 206, 221, 867 P.2d 610 (1994)). However, such evidence may "be admissible for other purposes, such as proof of motive." ER 404(b).

We review a trial court's ruling pursuant to ER 404(b) for an abuse of discretion. State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002) (citing State v. Dennison, 115 Wn.2d 609, 627-28, 801 P.2d 193 (1990)). Abuse of discretion occurs "only where the decision of the trial court was manifestly unreasonable or based on untenable grounds." State v. Freeburg, 105 Wn. App. 492, 497, 20 P.3d 984 (2001) (citing Powell, 126 Wn.2d at 258). A trial court abuses its discretion only if no reasonable judge would adopt the view espoused by the trial court. State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001).

> For evidence of prior bad acts to be admissible, a trial judge must "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." Vy

> Thang, 145 Wn.2d at 642 (citing [State v.] Lough, 125 Wn.2d [847,] 853[, 889 P.2d 487 (1995)]). "This analysis must be conducted on the record." State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (citing State v. Smith, 106 Wn.2d 772, 776, 725 P.2d 951 (1986)). The trial court must also give a limiting instruction to the jury if the evidence is admitted. Id. (citing Lough, 125 Wn.2d at 864).

State v. Gunderson, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014).

"Motive, for purposes of the admissibility of evidence under ER 404(b), 'goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act.'" State v. Baker, 162 Wn. App. 468, 473-74, 259 P.3d 270 (2011) (quoting Powell, 126 Wn.2d at 259).

> A number of cases dealing with the admissibility of evidence of prior assaults and quarrels have found that "[e]vidence of previous quarrels and ill-feeling is admissible to show motive." State v. Hoyer, 105 Wash. 160, 163, 177 P. 683 (1919). Evidence of prior threats is also admissible to show motive or malice. State v. Gates, 28 Wash. 689, 697-98, 69 P. 385 (1902); see generally [State v. ] Americk[, 42 Wn.2d 504, 256 P.2d 278 (1953)]; 1 Charles E. Torcia, Wharton's Criminal Evidence § 110, at 389-90 (14th ed. 1985). However, such evidence must also be of consequence to the action to justify its admission. *Since establishing motive is often necessary when only circumstantial proof of guilt exists, prior misconduct evidence that demonstrates motive is of consequence to the action in a case such as this.* See WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR. CRIMINAL LAW § 3.6, at 227 (2d ed. 1986).

Powell, 126 Wn.2d at 260 (emphasis added); see also State v. Athan, 160 Wn.2d 354, 382, 158 P.3d 27 (2007) (citing Powell, 126 Wn.2d at 260). Indeed, to show motive, "[e]vidence of a past attack by a defendant toward a victim is admissible pursuant to ER 404(b) if the evidence demonstrates an ill feeling between the two." State v. Arredondo, 188 Wn.2d 244, 260, 394 P.3d 348 (2017) (citing Powell, 126 Wn.2d at 260-61) (defendant's involvement in prior shooting demonstrates "highly strained and toxic relationship between local . . . gang

members"). Notably, both our Supreme Court and this court have affirmed trial court rulings admitting evidence of a defendant's prior acts of domestic violence in an intimate partner murder prosecution when the evidence was offered to show the defendant's motive. See, e.g., Americk, 42 Wn.2d at 506-08; State v. Neslund, 50 Wn. App. 531, 545, 559, 749 P.2d 725 (1988).

Here, the trial judge explained,

Okay. Well, here is what we've got, let me see if I can break this down for you. We have observations by witnesses, we have Janet Ford, who the State tells me, and I assume that the State's representations about what these witnesses have said in interviews is sufficiently accurate, that the State can at least present these incidents by a preponderance of the evidence. The other witnesses -- so in terms of observed behavior, we have Janet Ford, who indicates that back in 2009, 2010, that she saw arguments between the defendant and the victim and she saw, on one occasion, when the victim had a black eye. We have Jennifer Hallman who, apparently knew the parties between 2008 to late 2013, in particular, 2009 to 2012. And from what I gathered from the State, she actually saw the defendant throw a -- at the victim, she heard that the defendant threaten to kill the victim if she took Levy. She saw the defendant coming to the work place, she saw the victim lock herself in a closet, and she saw security escort the defendant from the property. This is all observed behavior, not statements from the victim.

From this, the trial court reasoned,

[E]vidence of a troubled, hostile, angry, or otherwise dysfunctional relationship seems usually to be admissible to show motive, in particular, in a situation where the State's evidence is circumstantial, which is this case, primarily. There is no direct evidence in this case that I can see, other than the DNA evidence, and I think when you have parties with an intimate relationship, it is still circumstantial, at bottom. So it seems to me, to the extent we have observed behavior here, the observed arguments, the observed black eye, the observed throwing of the vase, the observed threats to kill, the observed coming to the work place, the observed locking of the victim of herself in a closet, the observations of the defendant being escorted from the property, this all tends to be evidence that establishes the nature of this

relationship. And to the extent that the text messages between the parties show close in time the event, that the relationship continued to be a troubled one with a lot of tension between the two of them, under the existing cases that I have seen, that is admissible to establish motive. And to the extent that these things are close in time to the event, I do truly think they are res gestae in the sense of completing the story of what the relationship between the parties was.[2]

The trial court accordingly concluded,

[T]he behaviors that were reported here[] tend to suggest that this was an abusive, violent relationship, and that there was behavior that indicated fear of the defendant and the need for the defendant to be taken from the property tends to indicate that the defendant understood there was fear of him, it tends to show the nature of the relationship, and it tends to eliminate [sic] what his motive may have been in killing this particular person in the circumstantial evidence case. So I think it is probative on motive.

The trial judge's ruling was sound. The trial judge identified that Hallman's and Ford's observation testimony was probative of Cushman's motive because their testimony supported the allegation that Cushman had a history of abusive, threatening, violent, assaultive, and controlling behavior toward Hargrove. Moreover, as well-reasoned by the trial judge, this testimony was highly probative in this matter because the State's murder charge was brought in significant reliance on circumstantial evidence. Thus, the trial court did not abuse its discretion.[3] There was no error.

---

[2] The trial court also ruled that the State could not offer the evidence of Cushman's prior bad acts against Hargrove to support an alleged intent to commit the charged murder offense.

[3] Cushman nevertheless relies on two appellate decisions, Powell, 126 Wn.2d 244, and Baker, 162 Wn. App. 468, for the proposition that "prior domestic violence between the defendant and the victim is not relevant or admissible to prove motive unless it is close in time to the current offense." Br. of Appellant at 14. In each decision, however, the trial court's decision to admit the evidence was *affirmed* by the appellate court and neither decision, in actuality, sets forth the negative proposition proffered by Cushman. His reliance is thus unavailing.

Cushman also relies on our decision in State v. Sargent, 40 Wn. App. 340, 351-52, 698 P.2d 598 (1985). However, because Sargent regarded evidence of a prior bad act offered to show intent, rather than motive, Sargent does not lend support to Cushman's argument.

B

Cushman next contends that he was denied effective assistance of counsel because his attorney did not impeach DeMarce's testimony with a prior third degree theft conviction. We disagree.

To establish a claim of constitutionally ineffective assistance of counsel, a defendant must establish "that (1) counsel's performance, when considered in light of all the circumstances, fell below an objectively reasonable standard of performance and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." State v. Woods, 198 Wn. App. 453, 461, 393 P.3d 886 (2017) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Failure to satisfy either part of the analysis ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). The defendant bears the burden of demonstrating deficient representation and prejudice. In re Det. of Hatfield, 191 Wn. App. 378, 401, 362 P.3d 997 (2015).

"Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). "[T]he presumption of adequate representation is not overcome if there is any '*conceivable* legitimate tactic' that can explain counsel's performance." Hatfield, 191 Wn. App. at 402 (emphasis

---

Cushman next relies on our Supreme Court's opinion in Gunderson, 181 Wn.2d 916. But Gunderson regarded inadmissible prior bad act evidence offered to impeach the defendant's testimony in the prosecution of a felony violation of a court order. The circumstances herein are materially different.

- 11 -

added) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Prejudice is established when there is a reasonable probability that the outcome of the proceedings would have been different had counsel's performance not been deficient. McFarland, 127 Wn.2d at 337.

Here, prior to DeMarce's testimony, Cushman's counsel indicated that he would not seek to impeach DeMarce's testimony with a pending misdemeanor theft charge.[4] DeMarce then testified, stating that she was with Cushman when he accepted law enforcement's invitation to go to the police station, that she had inquired of Cushman regarding his need to go to the police station, and that Cushman had replied, "It is okay, I did something really stupid. It is okay, I -- I covered it up."

DeMarce later concluded her testimony and another witness testified. Then, after the jury had been dismissed for the day, the trial judge notified counsel for both parties that she had discovered that DeMarce had been convicted of theft in the third degree on November 8, 2007, nearly a decade earlier. Defense counsel for Cushman did not seek to recall DeMarce in order to impeach her with this prior misdemeanor theft conviction.

At trial, defense counsel's trial theory was that Cushman had unknowingly violated the no-contact order and was innocent of the murder and attempted arson charges. In closing, defense counsel argued that the "something really stupid" that Cushman was referring to was not murdering Hargrove but, rather, was his covering up of the violation of the no-contact order.

---

[4] The colloquy with the trial judge reflected that DeMarce's pending misdemeanor theft charge might be dismissed upon her completion of certain conditions.

Defense counsel's representation was not constitutionally ineffective. It is reasonably conceivable that defense counsel did not wish to impeach DeMarce because such impeachment would not advance the defense theory of the case that Cushman had been in the presence of Hargrove that day (in unknowing violation of the no-contact order) but had not murdered her.[5] Moreover, it is conceivable that a reasonable defense counsel would not seek to recall a witness that had already been excused to merely impeach the witness with a decade-old misdemeanor theft conviction. Furthermore, it is a conceivable legitimate tactic to refrain from impeaching a witness with such an old and minor conviction when such impeachment might result in a negative emotional response by the jury against defense counsel and, by association, against the defense case.

Even had defense counsel's performance been deficient, there is not a reasonable probability that, but for such performance, the result of the proceeding would have been different. Indeed, assuming defense counsel had impeached DeMarce with the nearly decade-old conviction, there remains in the trial record testimony supporting Cushman's history of violence and abuse toward Hargrove, testimony relating to Cushman's car being in the vicinity of Hargrove's residence on January 5, the police interview of Cushman admitting that he had visited Hargrove on January 5, and video camera footage showing Jones and DeMarce getting into Cushman's car on the day that DeMarce

---

[5] Indeed, defense counsel's theory was partially successful—the jury acquitted Cushman of the charged count of attempted arson in the first degree, an offense with a greater seriousness level than the crime of felony violation of a no-contact order. See RCW 9.94A.515, .525(6).

testified that Cushman said that he did "something stupid." In this light, there is no reasonable possibility that, had defense counsel impeached DeMarce with the prior conviction, the jury's verdicts would have changed.

Cushman establishes neither requirement of the Strickland inquiry. He was not denied his right to constitutionally effective representation. There was no error.

C

Cushman next contends that the prosecutor engaged in misconduct that deprived him of his right to a fair trial because the prosecutor's statements in rebuttal closing argument shifted the State's burden of proof. This is so, Cushman asserts, because the prosecutor complimented defense counsel as a "very good defense attorney" who "advocate[ed] in the strongest way the defendant's best perspective." We disagree.

A criminal defendant has no duty to present evidence and it is error for the prosecutor to suggest otherwise. State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). An argument that shifts the State's burden to prove guilt beyond a reasonable doubt constitutes misconduct. State v. Thorgerson, 172 Wn.2d 438, 453, 258 P.3d 43 (2011); State v. Gregory, 158 Wn.2d 759, 859-61, 147 P.3d 1201 (2006).

However, a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory of the case. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). A prosecutor has wide latitude to comment on the evidence introduced at trial and to draw reasonable inferences from the

evidence. Thorgerson, 172 Wn.2d at 448. The "mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense." State v. Jackson, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009). We evaluate the challenged statements in "the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

The prosecutor's statements in rebuttal closing argument began as follows:

> MR. DERNBACH: Thank you. So as the Court and Mr. Hicks had pointed out, I bear the burden of proof, which is why I get the last word. This is my opportunity to point out all of the reasons why the arguments that Mr. Hicks made for you this morning do not amount to a reasonable doubt in this case. Most of the reasons for that is going to be because many of the arguments that Mr. Hicks made were simply not supported by the facts and the evidence that you have heard in this case. . . . The short answer in this case is that I will remind you again, I will start where I began yesterday, and that is with the burden of proof. And that the reasonable doubt instruction that you have in instruction No. 3 sets forth that a reasonable doubt is one in the mind of a reasonable person, based on the evidence or lack of evidence. It is not something that's made up, it is not something that's a phantom doubt, it is something that is based upon the evidence or lack of evidence that you would have seen in this courtroom.

Thereafter, the prosecutor stated that the argument presented by defense counsel did not support a reasonable doubt based on the evidence adduced in the case.

> Now, I will say, as I think you probably have noticed in this trial, that Mr. Hicks and I have a mutual respect for each other. He is a *very good defense attorney*, we have often referred to each other as opposing counsel, but I actually like to think of it more as partners in justice. This system doesn't work without a prosecutor and

defense attorney here. And it is helpful for both me, and *I think it is helpful for you to have somebody advocating in the strongest way the defendant's best perspective on a case.* Because when those arguments fail, as they do in this case, it helps you to make a decision beyond a reasonable doubt, based on the evidence that you heard, in returning a guilty verdict.

(Emphasis added.) Thereafter, the prosecutor individually addressed several "of the arguments that defense counsel made." No objection was interposed in response to these statements.

Notably,

> [w]hen counsel does not object to a prosecutor's alleged misconduct, request a curative instruction, or move for a mistrial, appellate review of the prosecutor's conduct is precluded unless it was misconduct so flagrant and ill intentioned that no instruction could erase the prejudice engendered by it. State v. Belgarde, 110 Wn.2d 504, 507, 755 P.2d 174 (1988); State v. Dunaway, 109 Wn.2d 207, 221, 743 P.2d 1237, corrected, 749 P.2d 160 (1987). If unchallenged misconduct was so inflammatory that an instruction would not have cured it, reversal of the conviction is required if there is a substantial likelihood that the misconduct affected the jury's decision. Belgarde, 110 Wn.2d at 509-10; State v. Barrow, 60 Wn. App. 869, 876, 809 P.2d 209, review denied, 118 Wn.2d 1007 (1991).

State v. Fiallo-Lopez, 78 Wn. App. 717, 726, 899 P.2d 1294 (1995).

Cushman does not establish that the prosecutor's compliments to defense counsel during closing argument constituted flagrant and ill-intentioned misconduct. There is no clear indication that the prosecutor's statements regarding defense counsel were a blatant attempt to shift the State's burden of proof. Indeed, based on the context of the comments, it is clear that the prosecutor was merely complimenting defense counsel's reputation and performance, acknowledging the positive impact of good legal representation on

- 16 -

the criminal justice system, and urging the jury to nevertheless reject defense counsel's arguments.

Cushman nevertheless contends that the prosecutor's statements improperly shifted the State's burden of proof because the statements "asked the jury to assume there was no reasonable doubt because defense counsel had not supplied it." Br. of Appellant at 29.

Cushman does not show that the prosecutor's statements constituted flagrant and ill-intentioned misconduct. Cushman's argument is predicated on the incorrect notion that the prosecutor had emphasized the lack of evidence supplied by defense counsel. The prosecutor's rebuttal argument, however, rather than emphasizing a lack of evidence adduced by defense counsel, iterated that it was the defense counsel's *arguments* that were lacking. Indeed, the prosecutor's argument in rebuttal explicitly stated that, notwithstanding defense counsel's strong "advocac[y]", defense counsel's "arguments fail." In this light, the prosecutor's rebuttal argument did not mention—or even reasonably imply—that defense counsel had an obligation to produce evidence or articulate reasons to doubt the State's case. Thus, the prosecutor's statements in rebuttal closing argument did not improperly shift the State's burden of proof.[6]

There was no error.

---

[6] Cushman relies on State v. Cleveland, 58 Wn. App. 634, 794 P.2d 546 (1990), in claimed support of his contention that the prosecutor's rebuttal statements here at issue improperly shifted the State's burden of proof. Cushman's reliance is unavailing. Unlike here, Cleveland regarded not only prosecutorial misconduct to which an objection had been interposed before the trial court but also involved statements that "a good defense attorney" like the defense counsel therein "would not have overlooked any opportunity to present admissible, helpful evidence to you"—i.e., closing argument improperly regarding defense counsel's evidence, rather than defense counsel's arguments. 58 Wn. App. at 647.

D

Cushman next contends that he received ineffective assistance of counsel because his lawyer did not argue at sentencing that, for the purpose of calculating his offender score, his convictions for murder in the second degree and felony violation of a no-contact order constituted the same criminal conduct. We disagree.

As an initial matter, uncertainty over whether two acts constitute the same criminal conduct for sentencing purposes does not allow Cushman to succeed on an ineffective assistance of counsel claim. Rather, for Cushman to prevail, he must show that his counsel's performance was deficient and that this deficient performance prejudiced his defense. Failure to establish either requirement is fatal to a claim of ineffective assistance of counsel. Strickland, 466 U.S. at 697.

Again, there is a strong presumption that counsel's representation was effective. McFarland, 127 Wn.2d at 335. This presumption can be rebutted if the defendant proves that his attorney's representation "was unreasonable under prevailing professional norms.'" In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004) (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)). Notably, however, "[c]ounsel's failure to raise [a] novel argument does not render his performance constitutionally ineffective." Anderson v. United States, 393 F.3d 749, 754 (8th Cir. 2005).

Here, Cushman asserts that both the murder and felony violation of a no-contact order involved the same intent, the same victim, and the same time and place and that these crimes thus encompass the same criminal conduct.

Therefore, Cushman continues, these crimes should have been counted as a single crime for purposes of sentencing and his attorney should have so argued at sentencing.

However, as we have previously explained, "[t]he legislature [has] recognized that violation of a no-contact order is *a crime against the court* and punishable as contempt of court." State v. Moreno, 132 Wn. App. 663, 671, 132 P.3d 1137 (2006) (emphasis added) (citing RCW 26.50.110(3)). Hence, because these crimes do not involve the same victim, they do not encompass the same criminal conduct. An argument to the contrary by Cushman's attorney would have failed and, consequently, so must his claim for ineffective assistance of counsel.[7]

Appellate counsel, highlighting the seeming inconsistencies between our Supreme Court's decisions in State v. Chenoweth, 185 Wn.2d 218, 370 P.3d 6 (2016), and State v. Dunaway, 109 Wn.2d 207, 743 P.2d 1237, 749 P.2d 160 (1988), nevertheless posits an inspired argument in favor of a determination that Cushman's unlawful actions here at issue constituted the same criminal conduct and that counsel was ineffective for failing to raise such an argument. However, the Constitution does not require appointed counsel to be inspired. It requires counsel to be, at least, reasonably competent. We see no indication that counsel's performance fell below that standard.

---

[7] Cushman presses an argument that Moreno was wrongly decided. However, an attorney is not constitutionally ineffective merely because the attorney chooses not to argue that precedent should be overturned. Brown v. United States, 311 F.3d 875, 878 (8th Cir. 2002) ("[C]ounsel's decision not to raise an issue unsupported by then-existing precedent did not constitute ineffective assistance.").

There was no error.[8]

Affirmed.

We concur:

---

[8] In a statement of additional grounds, Cushman contends that he received ineffective assistance of counsel because his attorney did not request that the jury be issued an instruction on the lesser crime of manslaughter in the first degree. However, Cushman does not rebut the presumption that his counsel was effective. Again, "the presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that can explain counsel's performance." Hatfield, 191 Wn. App. at 402 (emphasis added) (quoting Reichenbach, 153 Wn.2d at 130).

Here, we can conceive of a legitimate tactic supporting defense counsel's alleged omission. Indeed, requesting such an instruction would be inconsistent with defense counsel's trial theory—general denial—because it would place counsel in the position of presenting two conflicting defenses to the jury: that Cushman was innocent of killing Hargrove and, alternatively, that he had killed Hargrove but had committed the act while under a less culpable mental state than that required for the charge of murder in the second degree. It is a legitimate tactic for defense counsel to elect to not present such conflicting defenses to the jury. This is especially so when, as here, defense counsel successfully sought a lesser included offense instruction on murder in the second degree. Counsel's decision was both tactical and successful.

There was no error.