IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36062-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ARNULFO ROMERO BRAVO, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Arnulfo Bravo appeals his conviction for first degree manslaughter. We affirm the conviction but remand with directions to grant him *Ramirez*[1] relief.

FACTS AND PROCEDURAL BACKGROUND

On October 1, 1991, Barbara Kipp was found dead in her Moses Lake home by her longtime roommate, Charles Flowers. The cause of death was not apparent. Arnulfo Bravo, who Ms. Kipp was dating and who was then living with Ms. Kipp and Mr. Flowers, was absent. Mr. Flowers called police and a Moses Lake police officer and the Grant County Coroner responded. Mr. Flowers later realized his car was missing, as was some of Ms. Kipp's jewelry.

---

[1] *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

Arnulfo Bravo was a suspect in Ms. Kipp's death from the beginning. When first interviewed by Detective Ron Varner on October 8, 1991, Mr. Bravo admitted he had found Ms. Kipp dead on the night of Sunday, September 29, but denied killing her. He said that after Ms. Kipp returned from work Sunday morning at about 7:45 a.m. (she worked nights, 11:00 p.m. to 7:00 a.m., as a private nurse) the two of them had spent the day together. That morning and into the afternoon they went to several bars and drank heavily. After running an errand in the afternoon, they went home, ate pizza, drank some more, and went to sleep.

Mr. Bravo told the detective that he and Ms. Kipp woke up around 9:45 or 10:00 p.m. Ms. Kipp fixed a lunch to take to work, and Mr. Bravo went to the store to buy cigarettes around 10:05 p.m. He claimed that when he returned about 10 minutes later, he found Ms. Kipp on her back on the floor, near the front door. He felt for a pulse and put his ear to her chest, but could not hear or feel anything. He did not call an ambulance or get help because he was sure she was dead and he was afraid he would be put in jail. He took her lunch, some beer, and some other items, including her jewelry box and the watch she was wearing, and left in Mr. Flowers's car. Realizing he needed money for gas, he returned to the house and took a couple hundred dollars from Ms. Kipp's purse. He then drove to California and stayed for several days with a sister and friends before returning to Moses Lake, where he agreed to be interviewed by Detective Varner.

2

Asked by the detective whether he ever physically fought with Ms. Kipp, Mr. Bravo stated that had only happened twice, when he had grabbed her arms. The first time, he grabbed her hard enough to leave bruises. The second time was on the day Ms. Kipp died, when he heard her on the phone with her ex-boyfriend. He told the detective that he grabbed her by the arms, shook her, and told her she needed to make up her mind about who she wanted to date. When Detective Varner told Mr. Bravo that others said Ms. Kipp planned to leave Mr. Bravo and move to Montana, Mr. Bravo denied knowing of any such plan.

Asked by the detective about any drug use by Ms. Kipp, Mr. Bravo said she had bought and used speed, but not very often. Mr. Bravo did not know if she used any the day she died.

On October 25, 1991, Detective Varner interviewed Mr. Bravo a second time. When told by the detective that he was hearing from people that Mr. Bravo was a jealous person and possessive of Ms. Kipp, Mr. Bravo said it was Ms. Kipp who was jealous, and did not like him to go to the bar alone. He said they agreed they would only go together. When the detective asked if he had ever threatened Ms. Kipp by tossing a bullet down and telling her he would use it to kill her if she ever left, Mr. Bravo admitted that he once put a bullet in front of her and said something to her in Spanish. He told the detective Ms. Kipp later accused him of saying the bullet was for her, but he told her "that's bullshit," and that he did not have a gun. Ex. 21 at 10.

3

Mr. Bravo pleaded guilty to theft for taking Ms. Kipp's belongings. He was sentenced in November 1991 to a period of total confinement of 43 days, which he had already served, and to 12 months' community supervision.

The cause of Ms. Kipp's death was still undetermined at the time of Mr. Bravo's release. Grant County Coroner Penny Sibley was not a medical doctor and had arranged for Ms. Kipp's autopsy to be performed by Dr. Gerald Rappe, the Chelan County coroner. Dr. Rappe performed the autopsy on the day after the body was found, with Coroner Sibley and Detective Varner in attendance.

Dr. Rappe would testify at trial that at the time he performed the autopsy, he concluded that Ms. Kipp had been strangled, but he was not yet sure she was strangled to death. Bruising was not initially visible on Ms. Kipp's neck because it was obscured by lividity, which is a red/purple coloring of the skin caused by the postdeath pooling of blood.[2] He microscopically examined neck skin, however, and found bruising in those samples. He also found bruising in the deep muscles of Ms. Kipp's neck around the hyoid bone and in the strap muscles of the neck, all about the size of the end of a finger. But there was no damage to the hyoid bone, as might occur with aggressive strangulation, and no scratches on the neck from fingernails. Ms. Kipp had small petechiae in the eyes, indicative of increased venous pressure in the neck and head that can be caused by

---

[2] Dr. Rappe explained that gravity is the principal force controlling where blood pools in the body after death. In Ms. Kipp's case, however, she had considerable fat in her abdomen and chest that compressed the blood, pushing some into her neck and head.

4

strangulation. But she also had foam coming out of her nose and mouth, which he was inclined to associate with foamy pulmonary edema from a drug overdose. Given the possibility of an overdose, he ordered comprehensive toxicology screening.

A little over six months after the autopsy, Coroner Sibley contacted Dr. Rappe and asked about the status of his report, and he turned back to reviewing the case. Based on the toxicology results, which did not reveal evidence of any drug that could cause an overdose, and after consulting with the King County medical examiner, Dr. Rappe issued a final report concluding that Ms. Kipp died from strangulation alone. He was satisfied after consulting with others that foamy pulmonary edema with strangulation is not uncommon, even though he had not seen it. Strangulation cuts off blood and oxygen to the brain, which causes brain cells to die within about four minutes. Brain damage, in turn, causes foamy pulmonary edema. He was also satisfied that strangulation often will not crack or break a flexible hyoid bone, and Ms. Kipp's was flexible.

In June 1992, the State charged Mr. Bravo with second degree murder and issued a warrant for his arrest, but he had by then moved away. It was not until almost 25 years later, in November 2016, that officers arrested Mr. Bravo in Texas and he was extradited to Washington to stand trial on the second degree murder charge.

Trial

The charge proceeded to a four day jury trial. The trial court found that three in-custody police interviews of Mr. Bravo (the two conducted in 1991 and a third conducted

5

in 2016) were knowing and voluntary. Transcripts of the two 1991 interviews were offered by the State and were admitted without objection. In evidentiary rulings made outside the presence of the jury, the trial court denied a defense motion in limine to exclude "bad acts" evidence of what the defense characterized as Mr. Bravo and Ms. Kipp's "stormy relationship." Report of Proceedings (RP) at 41. It agreed with the State that the problems in the couple's relationship were admissible to prove motive and intent.

The State called as its first witness Kristi Rambo, Ms. Kipp's daughter, who testified that she last saw her mother in September 1991, when Ms. Kipp traveled to Montana, where Ms. Rambo lived and had recently given birth to a baby boy. Mr. Bravo came along for the visit. Ms. Rambo testified there were arguments between Ms. Kipp and Mr. Bravo during the four or five day visit, because Mr. Bravo would not give Ms. Kipp and her daughter time to be alone together. She testified that before and after that visit, when speaking to her mother on the telephone, she often heard Mr. Bravo telling Ms. Kipp to get off the phone. She said this happened during the last conversation the two had, which took place a couple of days before Ms. Rambo found out Ms. Kipp was dead.

Dr. Rappe testified to his conclusion that the cause of death was strangulation and explained why. Dr. Rappe had also reviewed a report from the forensic pathologist who would testify for the defense and who concluded that a more likely cause of death was suicide by overdose. Dr. Rappe explained why he had ruled that out.

6

Dr. Rappe testified that he had comprehensive toxicology screening that revealed no sign of an overdose. It revealed only a blood alcohol content of 0.1 grams per deciliter (slightly over the legal limit) and did not test positive for anything else except caffeine and carboxyhemoglobin, which indicated she was a smoker.

Dr. Rappe also testified that microscopic examination of tissue from her kidneys revealed fresh acute tubular necrosis, which was significant in indicating that she had probably lived only about four hours after being strangled—not enough time for any drugs in her system to have metabolized. He explained that when a person has very low blood pressure (is hypotensive) after "four hours or so, maybe a little less," cells in the lining of the proximal convoluted tubule of the kidney lose their adhesion to the underlying collagen tissues and fall into, and block, the lumina of the tubule. RP at 273. The cells then begin to decay. In Ms. Kipp's case, the cells had come off the lining and clogged the lumen, but the cells themselves had not yet shown degenerative change. From this, he viewed it as "beyond a reasonable doubt" that she did not live more than four hours after being strangled. RP at 283. He expressed the further view that even if she had lived longer, drugs would still have been detected because she was hypotensive and "metabolism would have definitely been slowed." RP at 283-84.

Mr. Flowers testified for the State that at the time of Ms. Kipp's death, her dating relationship with Mr. Bravo was not going well. He testified that Ms. Kipp was planning to move to Montana "fairly soon," without Mr. Bravo. RP at 340. He testified that he

7

had been out of town on a hunting trip in late September 1991 and discovered Ms. Kipp's body on his return. He said that on entering the home and even before discovering Ms. Kipp's body, he noticed the kitchen was not clean and beer had not been put away in the refrigerator—two things that were out of character for Ms. Kipp.

Asked about any drug use by Ms. Kipp, he testified that the only drugs he ever observed in the house were nonprescription stimulants, called "hearts," that Ms. Kipp used to keep awake at work. RP at 344.

Detective Varner testified that he was called out to the scene on the afternoon Ms. Kipp's body was found. He testified that in investigating such a crime, he would have looked for any signs of drug use and noted any evidence in his report. He found no evidence of drug use at the home.

He also testified that following the autopsy, he was called out to the funeral home when the embalming process caused bruising to become visible. Pictures taken of the bruising were admitted into evidence, as were his earlier pictures taken on the day Ms. Kipp's death was discovered.

Other than having Detective Varner identify the transcripts of his two interviews of Mr. Bravo in October 1991, the prosecutor asked only a couple of questions about the interviews, stating, "I'm not going to go through these interviews in detail because we can read them." RP at 331. He did elicit testimony that when interviewed, Mr. Bravo claimed to have found Ms. Kipp dead within 10 to 15 minutes of leaving to buy

cigarettes, and admitted there had been "some conversations between the two of them about them breaking up and her possibly going back to Montana." RP at 332.

Before resting, the prosecutor offered as an exhibit the judgment and sentence from Mr. Bravo's conviction for the theft of Ms. Kipp's jewelry and cash. The exhibit was admitted without objection.

The only witness called by the defense was its expert, Dr. Carl Wigren. He expressed his opinion that there was not enough evidence to support the conclusion that Ms. Kipp died from strangulation.

Dr. Wigren attached much significance to a transcript he had read of a 1991 interview of Ms. Kipp's daughter, Ms. Rambo, by Detective Varner. During the interview, Ms. Rambo disclosed that her mother attempted suicide by pills after receiving a leukemia diagnosis in 1989. She also told the detective that while her mother had been in remission, she felt in 1991 that her symptoms were coming back. Dr. Wigren described Ms. Kipp's leukemia diagnosis as, in 1989, "essentially a death sentence." RP at 391. He testified that he was knowledgeable about suicide and suicide ideations from volunteering with a crisis hotline and his psychiatric rotation during medical school. He characterized the interview with Ms. Rambo and the re-emergence of symptoms of the leukemia as "key to this case." RP at 422.

Dr. Wigren described Ms. Rambo as telling Detective Varner that before her death Ms. Kipp had acted "different," "real mellow, real calm" and she had never seen her act

9

that way before. RP at 430-31. He attached significance to Ms. Rambo's report to the detective that Ms. Kipp talked to her about what she wanted to happen when she died, such as where she wanted to be buried and that she wanted to be buried in a shirt, jeans, boots, and specific earrings. He said Ms. Rambo told the detective that at the end of her last visit, Ms. Kipp left her ring and watch with her daughter and did not mention upcoming trips when she said goodbye, which was unusual for her. Dr. Wigren said this could mean Ms. Kipp was planning her own death.

Dr. Wigren disagreed with Dr. Rappe's conclusion that Ms. Kipp must have died within 4 hours; he testified that the window for acute tubular necrosis to occur is 4 to 15 hours. He also testified that it was possible to find no sign of drugs in the system of someone who dies of an overdose because drugs are primarily metabolized by the liver and "[a]s long as the heart is beating and circulating blood through the body, the liver cells are doing their job." RP at 452.

When cross-examined, Dr. Wigren said he had not been provided with Mr. Bravo's statements to police. He was unaware that Ms. Kipp had a plan to move back to Montana and would need to know more about that to say whether it affected his opinion.

In rebuttal, the State recalled Ms. Rambo and questioned her about the 1991 interview by Detective Varner to which Dr. Wigren attached significance. Ms. Rambo said that when she told the detective about her mother's behavioral changes, it was in explaining her belief that her mother was afraid of Mr. Bravo, thought he would hurt her

10

if she left, and did not know what to do. She testified that when interviewed by Detective Varner, she was specifically asked if she thought her mother would have committed suicide, and said no. Asked by the prosecutor to read the explanation she gave Detective Varner during the 1991 interview, she read:

> Because she was happy, she was fine with life, she had so many things going for her. She was coming back to Montana, she was going to help me with my three children. My little twin brothers were there. She was just very happy and wanted to come home. She was ready to come home.

RP at 491-92. Ms. Rambo testified that her mother's plane ticket for Montana arrived at Ms. Kipp's Moses Lake home a couple of days after her body was found.

Jury instructions proposed by the State included not only an instruction on second degree murder but instructions on the lesser included offenses of first and second degree manslaughter as well. The State's theory remained that this was a second degree murder, however, and the defense remained a general denial of any charge.

In closing argument the prosecutor "walk[ed jurors] through" the transcripts of Detective Varner's two interviews of Mr. Bravo, which he told jurors, "[Y]ou haven't really seen yet." RP at 515. He stated, "I'll read the points that I think are important to you, [defense counsel] will bring out some stuff that he thinks are important, and then you look at it when you go back to the jury room." RP at 515-16.

The jury was sent to deliberate in the early afternoon of March 19, 2018, with the 64 admitted exhibits. The exhibits consisted of 61 photographs, the 102-page and 50-

page transcripts of Detective Varner's 1991 interviews of Mr. Bravo, and the 7-page

judgment and sentence for Mr. Bravo's 1991 theft conviction. The next morning, the

jurors submitted two questions, asking about the date pictures were taken and the time

and date that Mr. Flowers discovered the body and called police. The court instructed

them to rely on their memory and/or notes. The jury reached a verdict late that morning.

All told, the jury deliberated for slightly less than five hours.[3]

The jury found Mr. Bravo not guilty of second degree murder and guilty of first

degree manslaughter. The court sentenced Mr. Bravo to 41 months of confinement and

imposed legal financial obligations (LFOs), including a $200 filing fee and $50 sheriff's

service fee. Mr. Bravo appeals.

ANALYSIS

Mr. Bravo makes four assignments of error. One—a request for *Ramirez* relief

from the discretionary legal financial obligations imposed at sentencing—is not opposed

by the State and will be ordered.

Of the remaining three, we turn first to Mr. Bravo's claims of improper opinion

testimony and error in applying ER 404(b) before turning to the closer question of

ineffective assistance of counsel.

---

[3] The jury was sent to deliberate at 1:54 p.m. on March 19. The court informed the lawyers that it would release the jurors at 4:30 that afternoon unless they were close to reaching a verdict, in which case they would go until 5:00.

During the trial, jurors were asked to arrive in the morning by 8:45 a.m., to begin proceedings at 9:00. They reached a verdict at 11:21 a.m. on March 20.

I.   DR. RAPPE NEVER OFFERED AN OPINION ON GUILT

Mr. Bravo contends that Dr. Rappe invaded the province of the jury by improperly

offering an opinion on guilt, using the phrase "beyond a reasonable doubt."  Specifically,

he points to twice during in Dr. Rappe's testimony when the doctor stated his belief,

"beyond a reasonable doubt," that Ms. Kipp did not live for more than four hours after

being strangled.  *See* RP at 283.  No objection was made.  But Mr. Bravo now argues that

"[a]n opinion on guilt, even by mere inference, invades the province of the jury."

Opening Br. of Appellant at 17 (citing *State v. Montgomery*, 163 Wn.2d 577, 594, 183

P.3d 267 (2008)).

RAP 2.5(a) states the general rule that we will not review a claim of error that was

not raised in the trial court.  Mr. Bravo seeks to rely on the exception for manifest

constitutional error, *see* RAP 2.5(a)(3), but improper opinion testimony is not a manifest

constitutional error unless it is an explicit or nearly explicit opinion on an ultimate fact.

*State v. Kirkman*, 159 Wn.2d 918, 938, 155 P.3d 125 (2007); *Montgomery*, 163 Wn.2d at

594.[4]  Generally, an improper opinion on guilt will be an assertion pertaining directly to

the defendant.  *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993).

---

[4] Even when an opinion is explicit, there is no prejudice and thus no manifest error
if the jury was properly instructed that they "'are the sole judges of the credibility of
witnesses,'" and "'are not bound'" by expert witness opinions.  *Montgomery*, 163 Wn.2d
at 595 (quoting *Kirkman*, 159 Wn.2d at 937).  The jury was properly instructed here.  *See*
Clerk's Papers at 21, 27.

Opinion testimony is not improper if it is not a direct comment on the defendant's guilt, is otherwise helpful to the jury, and is based on inferences from the evidence. *Id.* at 578.

The opinion held by Dr. Rappe that Mr. Bravo challenges for the first time on appeal cannot qualify as manifest constitutional error. The time passing from when Ms. Kipp was strangled to when she died is not an ultimate fact. It is a fact relevant to the doctor's belief about the cause of death, was based on inferences from the evidence, and would be helpful to the jury. It was not a direct comment on Mr. Bravo's guilt.

Since it was not a comment on guilt, the fact that Dr. Rappe characterized the strength of his belief as "beyond a reasonable doubt" is not problematic. The time-honored use of that measure in criminal trials shows it is a helpful way of expressing the strength of a belief that falls short of absolute certainty but is more than a mere likelihood. It is language that is not off limits in contexts where it will not be confusing. If defense counsel had believed it *might* be confusing, he could have asked a clarifying question in cross-examination.

II.     THE TRIAL COURT PROPERLY DENIED MR. BRAVO'S MOTION TO EXCLUDE
        EVIDENCE OF HIS "STORMY RELATIONSHIP" WITH MS. KIPP

The court heard argument of Mr. Bravo's motion to exclude "bad acts" evidence of friction in his relationship with Ms. Kipp, explained on the record its findings on the required ER 404(b) analysis, and denied the motion. Mr. Bravo argues that the trial court

abused its discretion by admitting the evidence for a criminal propensity purpose and failing to engage in ER 403 balancing.

"Properly understood . . . ER 404(b) is a categorical bar to admission of evidence for the purpose of proving a person's character and showing that the person acted in conformity with that character." *State v. Gresham*, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). "[T]here is one improper purpose and an undefined number of proper purposes." *Id.* at 421. The rule identifies some proper purposes for which evidence of other crimes, wrongs, or acts is admissible; among them are motive and intent. ER 404(b).

Whatever the asserted purpose, the trial court begins by assuming that evidence of bad acts is inadmissible. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). It should then conduct an inquiry on the record and "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). We review a trial court's decision to admit evidence subject to ER 404(b) for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

In *State v. Powell*, 126 Wn.2d 244, 260, 893 P.2d 615 (1995), our Supreme Court noted that historically, courts had admitted evidence of prior misconduct in spousal

murder trials but the grounds for admission were not always clear. It undertook to clarify

the grounds for admission of evidence of misconduct in such cases, beginning with a

distinction between motive and intent:

> "Motive" is said to be the moving course, the impulse, the desire that induces criminal action on part of the accused; it is distinguished from "intent" which is the purpose or design with which the act is done, the purpose to make the means adopted effective.

*Id.* at 260 (quoting BLACK'S LAW DICTIONARY 1014 (6th ed. 1990)).

Like this case, *Powell* involved a charge of second degree murder, for Mr.

Powell's alleged fatal strangulation of his wife. The court observed that evidence of

quarrels or threats is generally admissible to prove motive, but "such evidence must also

be of consequence to the action to justify its admission." *Id.* It held that prior

misconduct evidence that demonstrates motive *is* of consequence in a murder prosecution

that relies on circumstantial evidence. *Id.* Since there were no witnesses to Mr. Powell's

wife's death (other than her murderer), the court found that much of the misconduct

evidence was properly admitted, including evidence of the couple's hostile relationship,

other assaults and altercations, the victim's efforts to leave and her statement that she was

seeking a divorce. *Id.* The same is true here.

The *Powell* court also observed that evidence of quarrels and threats between a

victim and defendant are probative on the question of intent. *Id.* at 262. On the facts of

Mr. Powell's case, however, it found that intent was not a disputed issue, was inherent in

16

the charged crime, and was therefore unnecessary. *Id.* at 261-62. In Mr. Bravo's case, by

contrast, the jury was instructed on lesser included manslaughter crimes, making intent

the materially distinguishing element. Motive and intent were proper purposes for

admitting the evidence.

Turning to Mr. Bravo's contention that the court performed an insufficient ER 403

analysis, the court explained,

> While I think this evidence is clearly prejudicial in the sense that it's used
> to try to sway the jury one way or the other, I don't see it as evidence that
> would lead to an emotional response. I think it's a piece of evidence that
> a juror can use and can still make a rational decision without, you know,
> having the emotions raised unduly. So I'll find that at this point the
> probative value is not outweighed by the prejudicial effect.

RP at 47. Little analysis was needed. It was clear that in a circumstantial case, evidence

of Mr. Bravo's "stormy relationship" with Ms. Kipp had a high probative value. The

analysis was sufficient.[5]

III.    WHILE DEFICIENT REPRESENTATION IS SHOWN, PREJUDICE IS NOT

For the first time on appeal, Mr. Bravo points out that the judgment and sentence

for his theft charge admitted as exhibit 80 included a criminal history disclosing that he

---

[5] Mr. Bravo also argues for the first time on appeal that the evidence lacked substantial probative value because it consisted of 25-year-old recollections. Opening Br. of Appellant at 28. One can imagine that Ms. Kipp's death might have seared the problems in Ms. Kipp's and Mr. Bravo's relationship into the memories of her daughter and roommate. We need not consider the argument, however, because it was never made to the trial court.

17

was convicted of criminal negligence in 1977. The criminal history appears at page 2 of

the 7-page document.

Also for the first time on appeal, he points out the following questioning at page

96 of exhibit 23, his October 8, 1991 interview by Detective Varner:

> Bravo:     I had about three years with Yakima County and . . . (unable
>            to understand) Walla Walla . . .
>
> Varner:    But about 18 months in Walla Walla?
>
> Bravo:     Inside, yeah.
>
> Varner:    Okay uh one thing about Walla Walla uh, and this is a
>            problem that people, why they don't like penitentiaries is that
>            people learn how to do things there which aren't good. They
>            . . . they learn illegal things. They learn how to do better
>            burglaries. They learn how to be better thieves. They learn
>            how to hurt people better. And one of the things that they can
>            learn while they're in prison is how to . . . how to kill people.
>            Uh, did you ever have nay [sic] problems while you were
>            down there in Walla Walla?
>
> Bravo:     (sighs)

Mr. Bravo argues he received ineffective assistance of counsel when his attorney

failed to object to admission of the judgment and sentence and failed to move to redact

the problematic questioning from the October 8 interview.[6] He argues there was no

legitimate tactical reason for defense counsel to have agreed to the admission of this

---

[6] Mr. Bravo's opening brief states that defense counsel was ineffective when he "failed to *move to exclude*, or for redactions of" the October 1991 interview. Opening Br. of Appellant at 14 (emphasis added). He does not assign error to the results of the CrR 3.5 hearing, however, and devotes argument only to the failure to redact the questioning at page 96 that is reproduced above. We will only consider the failure to request redaction of the questioning that is addressed by argument. *See* RAP 10.3(a)(6).

problematic evidence. He points out that the prior conviction was nearly the same crime for which he was convicted in this case. He argues that while Detective Varner's aggressive questioning about learning to kill in prison might have been legitimate investigation of a possible murder, it would have been excluded as trial evidence under ER 403 had an objection been made.

To prevail on a claim of ineffective assistance of counsel, Mr. Bravo must establish that (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a defendant fails to establish either prong, the court need not consider the other. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

We briefly address deficient performance. "The threshold for the deficient performance prong is high" and there is "'a strong presumption that counsel's performance was reasonable.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). We presume that a failure to object to evidence was the "product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007).

19

The State suggests that in withholding objection and not seeking redaction, defense counsel could reasonably, strategically, have wanted to convey that Mr. Bravo was not hiding anything, as a way of enhancing his credibility.

We note that defense counsel took pains to present evidence that prior to 1991, Mr. Bravo had a bad brush with law enforcement. When the State called as a witness Ritchie Norman, Mr. Bravo's former employer and friend, defense counsel asked in cross-examination about Mr. Bravo's explanation for why he fled upon finding Ms. Kipp's body.[7] Mr. Norman testified that within days of the discovery of Ms. Kipp's body, he told Detective Varner that in a call from California, Mr. Bravo told him, "one time before . . . he had been in some trouble and the cops didn't believe him and there's no reason for them to believe him now." RP at 233. Perhaps defense counsel thought providing an explanation for why Mr. Bravo was afraid police would not believe him, and fled rather than call 911, was more important than excluding evidence of the 25-year-old crime. He did not remind jurors of Mr. Norman's testimony in closing argument, however.

Mr. Bravo rightly notes that the criminal negligence conviction was not admissible under ER 609 and that prior convictions, particularly for crimes similar to those with which a defendant is currently charged, are generally inadmissible because of their

---

[7] The State's objection that the question called for hearsay was overruled, with the trial court explaining that the State's own questioning had opened the door.

potential for prejudice.  *See Hendrickson*, 129 Wn.2d at 78 (although n.b., the court did not find that Mr. Hendrickson's right to a fair trial was prejudiced; *see id.* at 80).

In *Strickland v. Washington*, 466 U.S. 668, 670, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court advised that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."  We find it easier to dispose of Mr. Bravo's claim by pointing out his failure to demonstrate prejudice.

A defendant claiming he received ineffective assistance of counsel must "affirmatively prove prejudice."  *Id.* at 693.  Courts find prejudice where but for an attorney's deficient performance, there was a reasonable probability of a different outcome that is "'sufficient to undermine confidence in the outcome.'"  *Grier*, 171 Wn.2d at 34 (quoting *Strickland*, 466 U.S. at 694).  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  *Strickland*, 466 U.S. at 693 (citation omitted).

The State never questioned any witness about Mr. Bravo's 1977 criminal negligence conviction or his time spent in the state penitentiary.  It never alluded to those matters in its questions, its opening statement, or in its closing argument.

In dealing with the October 8 police interview, the State did not play a video or audio recording for the jury nor did it arrange for each question and answer to be read to jurors during the State's case. The prosecutor only asked Detective Varner about a couple of Mr. Bravo's statements made during the interview. Instead, he relied on closing argument to identify the parts of the October 8 interview that he thought were important, briefly describing the substance and telling the jurors the page numbers on which those parts could be found. That portion of the prosecutor's closing argument consumes six pages of the report of proceedings. *See* RP at 516-21. As described by the prosecutor, the important parts of the interview end at page 91, with Mr. Bravo admitting that he grabbed and shook Ms. Kipp on the day of her death.

As for exhibit 80, the judgment and sentence, the prosecutor offered it at the very end of the State's case, immediately before resting. With no witness on the stand, he had no one to question about it. It was not published to the jury. Since it revealed conviction for a crime committed negligently, it did not have the same potential for prejudice as the two prior convictions of drug crimes admitted in the drug prosecution at issue in *Hendrickson*.

Neither side advocated that the jury should find Mr. Bravo guilty of second degree manslaughter, the alternative charge that was similar to his 1977 conviction. Indeed, neither side advocated that the jury should find him guilty of first degree manslaughter, the crime the jury decided was committed. Instruction on the lesser included crimes was

proposed by the prosecutor, who stated at oral argument of the appeal that he probably did it out of habit. In retrospect, he observed, it was probably not appropriate to have instructed the jury on second degree manslaughter, since strangulation is not something that can be done negligently. Wash. Court of Appeals oral argument, *State v. Bravo*, No. 36062-8-III (Dec. 5, 2019) at 13 min., 6 sec. through 14 min., 5 sec.[8] He defended the jury as having "got it exactly right" in finding first degree manslaughter, given Dr. Rappe's testimony (undisputed by Dr. Wigren) that Ms. Kipp lived for at least four hours. Wash. Court of Appeals oral argument, *supra*, at 11 min., 33 sec. through 12 min., 27 sec.

The State presented sufficient evidence of death by strangulation and evidence of motive. It was undisputed that Mr. Bravo was the last person to see Ms. Kipp alive. While the defense presented competing forensic evidence as to the cause of death, the significance that Dr. Wigren attached to Ms. Rambo's 1991 statement was directly contradicted by her. Most importantly, Dr. Wigren's overdose theory was irreconcilable with Mr. Bravo's consistent statements to police and his employer that he was only gone for 10 minutes and returned to find Ms. Kipp dead.

Roughly three hours into deliberations, the jury submitted two questions to the court that reveal the jurors were interested, properly, in the experts' competing evidence

---

[8] Available at http://www.courts.wa.gov/appellate_trial_courts/appellateDockets /index.cfm?fa=appellateDockets.showOralArgAudioList&courtId=a03&docketDate=201 91205.

of the cause of death. The jurors had been properly instructed. They deliberated for a reasonable time. There is nothing in the record that their deliberations went astray because of something they found in exhibits 23 or 80.

For all of these reasons, Mr. Bravo's appellate counsel was questioned closely during oral argument about how Mr. Bravo was prejudiced. She could argue only that, conceivably, information about Mr. Bravo's 1977 conviction and incarceration had an effect on the outcome of the proceedings. She identified nothing tangible that would undermine confidence in the outcome. She ultimately urged us to focus on deficient performance, which she characterized as the "nut of the issue."[9] Deficient performance is only one nut of a two-nut issue, however.

---

[9] In response to a concluding question about how admission of the evidence would have affected the jury's deliberation or verdict, counsel argued that while factual issues are important, they are "not as important as counsel's error," continuing,

> There was no legitimate reason for letting the J&S in, or the interview notes. And I think we need to remain focused there, rather than how exactly did the jury come to this, was it a compromise verdict, was it this . . . I mean I think we need to remain focused on that, because that's the question here, rather than how exactly the jury got to this manslaughter or should they have considered the manslaughter two rather than manslaughter one. I mean, I think really we need to get to the nut of the issue, which was counsel's choices.

Wash. Court of Appeals oral argument, *supra*, at 23 min., 3 sec. through 23 min., 43 sec.

No. 36062-8-III
*State v. Bravo*

We find no prejudice.  Finding no other error or abuse to discretion, the conviction is affirmed.  We remand with directions to strike the $200 filing fee and $50 sheriff's service fee from Mr. Bravo's judgment and sentence.[10]

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, C.J.

---

[10] Mr. Bravo is entitled to the relief in light of Engrossed Second Substitute House Bill 1783, which became effective June 7, 2018, and prohibits trial courts from imposing discretionary LFOs on defendants who are indigent at the time of sentencing.  LAWS OF 2018, ch. 269, § 6(3).  *Ramirez* holds that the changes apply to cases pending on direct review, which is the case here.

25