[No. 70636-1. En Banc.]
Argued September 20, 2001. Decided March 7, 2002.

THE STATE OF WASHINGTON, *Respondent*, v. VY THANG, *Petitioner*.

*Vy Thang*, pro se.

*Eric Broman, Eric J. Nielsen,* and *David B. Koch* (of *Nielsen, Broman & Koch, P.L.L.C.*), for petitioner.

*Steven J. Tucker, Prosecuting Attorney,* and *Kevin M. Korsmo, Deputy,* for respondent.

CHAMBERS, J. — We are asked to review (1) the scope of privacy rights of a guest whose host consents to a search of the premises and (2) the admissibility of prior bad acts under the identity prong of ER 404(b). Petitioner Vy Thang claims that evidence obtained during the search of an apartment where he was residing as a guest should have been suppressed, and that testimony concerning prior bad acts should not have been admitted. We hold that the search was constitutional, but that the admission of the prior bad act was error, and we reverse.

In August 1997, Thang and Simeon Terry, residents of the Maple Lane juvenile facility, escaped while on a field trip to a Seattle Seahawks game. They traveled to Spokane, where they stayed with various friends of Terry, eventually spending a few days with Jess Dietzen and Sean Lambert. Arrest warrants for the escape naming Thang and Terry were outstanding.

On September 2, 1997, John Klaus found his 85-year-old mother, Mildred, in Spokane lying dead on the floor of her home in a pool of blood. She had died from blunt impact injuries. The house was in disarray and it appeared that some of her personal possessions were missing. Her purse was later found on the roof of a neighboring building. Shortly afterwards, the police learned that possible escapees were residing at the Dietzen apartment. Warrants for the arrest of Thang and Terry were outstanding.

The police went to the Dietzen apartment, without warrants in hand, and arrested Terry and Thang. Thang was subsequently found guilty of first degree murder and sentenced to life imprisonment without the possibility of parole. On appeal Thang claimed, among other things, that the trial court erred in failing to suppress evidence obtained during the search of an apartment where he was staying and in admitting evidence of other bad acts. The Court of

Appeals affirmed the trial court. We will examine these two contentions in order.

## VALIDITY OF THE SEARCH

The police knew that arrest warrants for escape were outstanding for Terry and Thang, but did not have the warrants in their possession when they went to the Dietzen apartment. They suspected Terry and Thang may have been involved in the Klaus murder, but did not have sufficient probable cause for a warrant. Terry and Thang had been guests in Dietzen's apartment for several days. Upon arrival, the officers asked Dietzen for permission to enter the apartment to arrest Terry and Thang. Dietzen consented, and Thang and Terry were arrested in the living room. After the arrest, the police secured written permission from both tenants of the apartment for a search of the common areas. The police found women's jewelry in the bathroom garbage can and various items of women's clothing in a rollerblade bag in the hallway. The garbage can also contained a bloodied pair of socks. In preparation for transport, Thang identified his shoes, and later the police took possession of them. The DNA (deoxyribonucleic acid) from a blood spot on one of the tennis shoes and the bloodstains on a sock matched that of Mildred Klaus. Over Thang's objection, evidence obtained from the search was admitted at his trial.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause[.]" Article I, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Together, these provisions provide a bulwark against governmental intrusions into homes. Thang contends that he had been staying as a guest in the apartment for approximately a week and had a protected expectation of

privacy in the common areas of the apartment. He also contends that this was a warrantless search and, under *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998) and the "knock and talk" rule, the police were obligated to advise Dietzen and Lambert of their right to refuse permission. Thang concludes that without being advised of their right to refuse, both the consent to arrest and the written consent of Dietzen and Lambert were not voluntary and therefore invalid.

The State asserts that Thang was not entitled to an expectation of privacy. He was, after all, just a temporary guest in the Dietzen and Lambert apartment and could not have a reasonable expectation of privacy superior to that of his hosts. The State further argues that Thang had no right to be in the Spokane apartment at all; his only rightful location was in his cell, where he would have no right to privacy in his personal belongings. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 909, 952 P.2d 116 (1998), *habeas corpus granted on other grounds sub nom. Benn v. Wood*, No. C98-5131RDB, 2000 U.S. Dist. LEXIS 12741, 2000 WL 1031361, at *5 (W.D. Wash. June 30, 2000). The Court of Appeals agreed with the State on this latter point. The Court of Appeals, relying on other jurisdictions, adopted the escapee rule to support Thang's lessened expectation of privacy, concluding that Thang had no right to be anywhere other than his place of commitment and was no more than a trespasser at the time of his arrest.

■ First, Thang's reliance on *Ferrier* is misplaced, because here the police did not employ a "knock and talk" procedure. In a "knock and talk," the goal of the police is to search for contraband without first obtaining a warrant. They knock on a suspect's door, obtain the resident's permission to enter to discuss a complaint, and subsequently ask permission to search the premises. *Ferrier*, 136 Wn.2d at 107.

The *Ferrier* Court held that because a "knock and talk" is inherently coercive, failure to advise a defendant of the right to refuse entry violates the right to privacy granted by

article I, section 7 of Washington's Constitution and therefore vitiates the consent to search. *Ferrier*, 136 Wn.2d at 114-15. However, when the state is not employing the " 'knock and talk' " procedure, the court employs a " 'totality of circumstances' " test to determine whether consent to search is valid. *State v. Bustamante-Davila*, 138 Wn.2d 964, 981, 983 P.2d 590 (1999). Factors to consider are the education and intelligence of the consenting person, whether *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)) were given prior to consent, and whether the person was advised of his right to consent. *Bustamante-Davila*, 138 Wn.2d at 981-82. No one factor is dispositive. *Id.* at 982.

Here, although Dietzen and Lambert were not informed of their right to refuse entry to the apartment, the police did not draw weapons or order the residents of the apartment to open the door, and the police encountered no objection to their entry. Moreover, unlike the situation in *Ferrier*, where the police sought a pretext to search the premises, arrest warrants were outstanding for Terry and Thang. Therefore, on balance, we conclude the search is valid.

 Second, the Court of Appeals correctly observed that no Washington court has considered an escapee's expectation of privacy and therefore no Washington Court has adopted the escapee rule. We decline to do so in this case.[1] Moreover, by applying ordinary constitutional principles, we arrive at the same conclusion; Thang had no reasonable expectation of privacy to the areas searched.[2]

---

[1] Certainly the fact that a person has escaped is relevant to the person's expectation of privacy. On the other hand, the restrictions on Fourth Amendment rights afforded prisoners are related to maintaining institutional security, preserving order and allowing discipline. Whether the limited withdrawal of Fourth Amendment protections permitted within a prison should extend outside the prison atmosphere to one accused of escape, particularly when that person is suspected of a crime other than escape, is a significant question, which we do not address today.

[2] Thang asserts that the officers needed a search warrant to enter the apartment where he was staying in order to make the arrest. However, an arrest warrant was outstanding. When an arresting officer does not have the warrant in his possession, it is sufficient to inform the defendant that the warrant exists and

■ This Court has held that the subject of an arrest warrant has no greater protection in his host's residence than he would have at home. *State v. Williams*, 142 Wn.2d 17, 23-24, 11 P.3d 714 (2000). " '[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.' " *Id.* at 24 (quoting *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)). Moreover, Thang's hosts granted permission to enter their home.

■ Fourth Amendment protections against unreasonable searches and seizures are personal. *State v. Walker*, 136 Wn.2d 678, 684-85, 965 P.2d 1079 (1998). Thus, Thang must establish a personal right of privacy in order to challenge his arrest. A guest's expectation of privacy may be vitiated by consent of another resident. *State v. Rodriguez*, 65 Wn. App. 409, 828 P.2d 636, *review denied*, 119 Wn.2d 1019 (1992). In *Rodriguez*, the defendant was staying with his mother, who gave the police permission to enter the apartment to look for him. The police found him in the bathroom. The court determined that the mother's consent was sufficient and the police lawfully arrested the defendant:

> [S]ince he was only sharing the home, his expectation was not absolute. A host or third party who has dominion and control over the premises may consent to a search, whether it is for purposes of arrest or seizure of evidence.

*Rodriguez*, 65 Wn. App. at 414-15.

■ When one party consents to a warrantless search but another who has equal use and control of the premises objects, the consent is invalid. *State v. Leach*, 113 Wn.2d 735, 744, 782 P.2d 1035 (1989). Thang asserts that he had superior control because the police were seeking his possessions. However, Thang's socks were found in the communal garbage, and consent to search by a host is always effective

---

will be shown to him "as soon as possible on arrival at the place of intended confinement." RCW 10.31.030; *State v. Singleton*, 9 Wn. App. 327, 329, 511 P.2d 1396 (1973).

against a guest within the common areas of the premises. 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 8.5(d), at 794-95 (3d ed. 1996); *Leach*, 113 Wn.2d at 739. We therefore conclude that Dietzen's and Lambert's consent to the search was sufficient to render it constitutional.

## ADMISSION OF PRIOR OFFENSE

According to Terry, on August 29, 1997, Thang announced that he wanted to take a bike ride, borrowed Terry's black leather gloves, and left the apartment for about five hours. Terry further testified that Thang said he had broken into a woman's house through a side window, and kicked and killed an old lady, boasting "[t]he bitch is dead, this bitch is dead." Report of Proceedings (RP) at 195. Thang had with him a purse, from which he took approximately $60 in cash before throwing it onto a neighboring roof, where it was later found. He threw his bloodstained socks into the living room garbage can and washed his tennis shoes. Dietzen's and Lambert's testimony tended to corroborate Terry's account.

Thang countered that it was Terry who committed the murder and that Terry's friends were attempting to help Terry by shifting the blame to Thang. Initially, Terry denied any knowledge of the Klaus murder but later he offered to testify against Thang in exchange for a promise that he would be charged only with possession of stolen property. In order to test Terry's claim that he did not commit the homicide, police had Terry submit to a polygraph test.[3] The examiner concluded that he was 99 percent certain that Terry was being deceptive about his knowledge of the Klaus killing.[4] Despite these test results, the State entered into a

---

[3] Terry was asked three questions:

1. This September were you in that woman's residence (Mildred Klaus) when that woman was kicked or injured?

2. This September even one time did you hit or kick that woman?

3. Did you know for sure that woman was going to be robbed and killed?

Clerk's Papers at 68.

[4] The trial court suppressed the polygraph results at the State's request. In response to a prosecutor's question, Terry himself admitted on the stand that he had failed the test, but that testimony was stricken—again at the State's request.

plea bargain with Terry and Terry was permitted to testify against Thang. Dietzen and Lambert also changed their positions to substantiate Terry's postplea bargain version of events. Initially, both denied any knowledge of a murder. At Thang's trial, Dietzen testified that he too saw Thang leave the apartment and return with a backpack and purse. Lambert also corroborated Terry's version. It was Terry who testified that the bloody sock in the garbage belonged to Thang. Some physical evidence corroborated their testimony: the spot of blood on Thang's shoe, which matched that of Mildred Klaus and which was not explained by Thang's version of events.

On a defense motion in limine, the judge excluded testimony regarding a February 1996 conviction for robbery and burglary of Mrs. Morgan, an elderly woman, in Aberdeen. Thang, wearing a black bandana over his face, kicked in her back door while an accomplice knocked on the front door and pointed a gun at the victim. Thang kicked the woman three times and stole various items. During that crime, Thang allegedly said, "Where is your money, you bitch," and later "I think the bitch is dead." Clerk's Papers at 106-07. He fled in the woman's car. In ruling to exclude the evidence, the court specifically left open the possibility of introducing the evidence in rebuttal. In the same ruling, the defense was precluded from arguing that other suspects might have committed the crime without first showing, outside the presence of the jury, that the evidence was reliable.

After unsuccessfully challenging DNA evidence that put Thang at the scene of the crime, the defense focused almost exclusively on the identity of the killer. Defense counsel portrayed Thang as an outsider, and suggested in his opening statement that the State's key witnesses were closing ranks to protect Terry. The defense later introduced testimony from Lawrence Dusek, who had served time with Thang and Terry at Maple Lane. Dusek testified that he

had visited Terry and Thang at the Spokane apartment and Terry had confessed to killing Klaus. According to Dusek, Terry had stated that Thang kept watch outside while Terry killed the victim. After the killing, Terry called Thang inside and Thang rolled the victim over with his foot to look at her and yelled at Terry, cursing at him for being so dumb as to kill her. Dusek was a surprise witness who said he decided to come forward after reading an account of the trial in the newspaper.

After the defense rested, the judge ruled that because the defense had produced evidence that Terry was the killer, the State could introduce the prior offense for the purpose of showing identity. In anticipation of Morgan's testimony, the defense moved and was allowed to reopen. Thang first corroborated Dusek's testimony and contended that the blood on his shoes came from turning over Klaus's body with his foot. Thang then testified regarding the Aberdeen case, admitting that he had pushed Morgan to the ground and kicked her repeatedly. Thang said he thought he had killed Morgan, but denied saying, "where's the money, bitch" or "the bitch is dead." When the State called Morgan, she testified that two men broke into her house, threw her across the room, and kicked her three times in the ribs. However, having agreed only after extensive prompting that the statements were made, she was unable to identify Thang as the person who made them, so her testimony abruptly ended.

After Thang testified, the court ruled that the State could also use Morgan's testimony regarding the Aberdeen incident to rebut the allegation that the blood on Thang's shoes came from turning over the body rather than kicking the victim. Because Morgan could not remember who said what during the Aberdeen assault, the court excluded any testimony on this point, and instructed the jury to disregard the "bitch" question. The court then gave an instruction limiting the purpose to identity:

> With respect to the testimony of Ms. Morgan who was the last witness, evidence has been introduced in this case on the

subject of a prior act of the defendant's identity for the limited purpose of indicating identity. You must not consider this evidence for any other purpose.

RP at 950.

 Thang argues that the trial court erred in permitting evidence of the Aberdeen attack to establish the identity of the Spokane killer. Washington ER 404(b) provides:

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This Court reviews decisions to admit evidence under ER 404(b) for abuse of discretion. *State v. Dennison*, 115 Wn.2d 609, 627-28, 801 P.2d 193 (1990). Discretion is abused if it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Alternatively, the Court considers whether any reasonable judge would rule as the trial judge did. *State v. Nelson*, 108 Wn.2d 491, 504-05, 740 P.2d 835 (1987).

 To admit evidence of other wrongs, the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. *State v. Lough*, 125 Wn.2d 847, 853, 889 P.2d 487 (1995). In doubtful cases, the evidence should be excluded. *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986). In this case, the trial court found that the misconduct occurred and clearly identified the purpose of introducing the evidence (to establish identity). Thang challenges the third prong of the test, claiming that because the crimes did not feature unique characteristics, the prior crime had no relevance to the crime for which he was being charged.

When evidence of other bad acts is introduced to show identity by establishing a unique modus operandi, the evidence is relevant to the current charge "only if the method employed in the commission of both crimes is 'so unique' that proof that an accused committed one of the crimes creates a high probability that he also committed the other crimes with which he is charged." *State v. Russell*, 125 Wn.2d 24, 66-67, 882 P.2d 747 (1994) (quoting *State v. Hernandez*, 58 Wn. App. 793, 798-99, 794 P.2d 1327 (1990), *disapproved on other grounds by State v. Kjorsvik*, 117 Wn.2d 93, 812 P.2d 86 (1991)).

This Court has held that " '[t]he device used must be so unusual and distinctive as to be like a signature.' " *State v. Coe*, 101 Wn.2d 772, 777, 684 P.2d 668 (1984) (quoting EDWARD W. CLEARY, MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE § 190, at 449 (2d ed. 1972)). The greater the distinctiveness, the higher the probability that the defendant committed the crime, and thus the greater the relevance. *Coe*, 101 Wn.2d at 777-78. Moreover, to establish signature-like similarity, the distinctive features must be shared between the two crimes. *Smith*, 106 Wn.2d at 778-79. In *Smith*, the State sought to admit three burglaries when trying the defendant for three rapes, but this Court held that there were insufficient similarities between the burglaries and the rapes. *See also Coe*, 101 Wn. 2d at 779 (excluding testimony of a previous incident involving a replica of a penis where the rapes Coe was accused of did not involve any such replica).

Factors relevant to similarity include geographical proximity and commission of the crimes within a short time frame. *See, e.g., Russell*, 125 Wn.2d at 68 (allowing joinder of two signature-like murders occurring a few weeks apart in the Bellevue/Kirkland area); *See also Smith*, 106 Wn.2d at 779 (excluding evidence where the crimes were not committed on the same day or in close proximity). Another factor can be wearing similar clothing. *See, e.g., State v. Laureano*, 101 Wn.2d 745, 682 P.2d 889 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 128, 761

P.2d 588 (1988) (army fatigues), *aff'd on subsequent review*, 113 Wn.2d 520, 527, 782 P.2d 1013, 787 P.2d 906 (1989); *State v. Lynch*, 58 Wn. App. 83, 792 P.2d 167 (1990) (a brown wig). In Thang's case, there was neither geographic nor temporal proximity. The two crimes were committed at least 18 months apart, and were committed on opposite sides of the state. Neither was there evidence of similar clothing.

The next question is whether the similarities between the two crimes are unusual or distinctive. Thus, in a case where a robber entered the store, pulled a knife, asked for money and fled upon receiving it, the Court of Appeals held that although the crimes were similar, the shared features were not sufficiently unusual or unique to amount to a signature. *State v. Hernandez*, 58 Wn. App. at 799. In contrast, signature-like similarity was found between crimes involving victims approached by a man with the offer to sell salvaged televisions and video equipment at greatly reduced prices, where in each case the thief directed the victim to drive him to a certain location, took cash for the purchase, did not return to that location, and contacted the victim later. *Brown*, 111 Wn.2d at 128. Even when features are not individually unique, appearance of several features in the cases to be compared, especially when combined with a lack of dissimilarities, can create sufficient inference that they are not coincidental, thereby justifying the trial court's finding of relevancy. *State v. Jenkins*, 53 Wn. App. 228, 237, 766 P.2d 499 (1989) (holding that while pipe wrench burglaries, brown Camaros and ground floor entries are not individually unique, they create striking similarities when taken together, sufficient for a signature-like crime). Another close decision involved three people breaking into a dwelling after dark, use of a 20-gauge shotgun, and the presence of marijuana packaged the same way, in crimes occurring only three weeks apart. This Court, while acknowledging that reasonable minds could differ on the degree of similarity, upheld the trial court's action. *Laureano*, 101 Wn.2d at 764-65.

The shared features as represented to the court in this case are: (1) both cases involved theft of a purse and jewelry; (2) both victims were elderly; (3) in both cases, the perpetrator allegedly remarked that "the bitch is dead" and (4) both victims were kicked, Morgan three times and Klaus repeatedly. However, there are also several dissimilarities between the two crimes: (1) they occurred 18 months apart; (2) they took place in different parts of the state; (3) one victim was kicked three times and the other until she died; (4) In one case, entry occurred through a door, and in the other, through a window; (5) in one case, the perpetrators fled in the victim's car, and in the other case, on foot.

The question for the court to answer is whether all of these shared features, when combined, are so unusual and distinctive as to be signature-like. The trial court answered this question in the negative, observing, "the two incidents do not reflect as indicated earlier an over-arching design or plan nor specifically a signature type crime." RP at 876. Having concluded that the prior offense was not signature-like and that it was not admissible for any purpose other than to show identity, the trial court erred in admitting evidence of the Aberdeen crime. Moreover, the unique character of the statements relied upon was not established. The limiting instruction, although not objected to, did not cure the error because it limited consideration to identity, which would require a finding of signature-like similarity between the crimes. A curative instruction was required.

■ Evidence of the prior offense should have been stricken. In this case, potential prejudice outweighed probative value. The error was exacerbated by the prosecutor, who argued during closing argument: "[t]his is from a man that committed the same type of crime three years earlier." RP at 969. Then, after describing the similarities of attacking, throwing to the ground, and kicking a defenseless elderly woman, the prosecutor added, "[h]e was caught in 1996. He was sent to prison. He escaped. And what is the

first thing he does? He breaks into an elderly woman's home and in cold blood he kills her."[5] RP at 998.

The Court of Appeals concluded that Thang could not complain about the introduction of Mrs. Morgan's testimony about the 1996 offense because Thang, in anticipatory rebuttal, introduced the evidence first. The Court of Appeals concluded that the Morgan testimony was merely cumulative. We disagree.

It has been a long-standing practice for a defendant to mitigate the damaging effect of testimony regarding prior crimes by introducing the conviction during direct evidence, to take the sting out of the evidence. *See, e.g.*, IRVING GOLDSTEIN & FRED LANE, GOLDSTEIN TRIAL TECHNIQUE § 11.30, at 29 (2d ed. 1985); F. LEE BAILEY & HENRY B. ROTHBLATT, SUCCESSFUL TECHNIQUES FOR CRIMINAL TRIALS § 253, at 222 (1971). The three main reasons for preemptive disclosure are: (1) the triers of fact are more likely to trust the side that discloses the information, (2) it avoids the appearance of hiding information, and (3) the advocate can couch the information in sympathetic terms. L. Timothy Perrin, *Pricking Boils, Preserving Error: On the Horns of a Dilemma After* Ohler v. United States, 34 U.C. DAVIS L. REV. 615, 617 (2001). Practitioners and commentators alike continue to advocate the practice. *Id.* at 626.

In a five-to-four decision, the United States Supreme Court recently made preemptive disclosure extremely risky in federal courts, holding that under the Federal Rules of Evidence, a defendant who elects to introduce the evidence herself waives the right to object because the harm from a court's ruling permitting impeachment by a prior conviction is " 'wholly speculative.' " *Ohler v. United States*, 529 U.S. 753, 759, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (2000) (quoting *Luce v. United States*, 469 U.S. 38, 41, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)).

A strongly worded four-justice dissent in *Ohler* expressed a concern that the decision rested not on precedent but on

---

[5] Defense counsel objected to this comment on the grounds that it shifted the burden. The court sustained the objection and instructed the jury to "disregard any remarks of counsel which are not supported by the evidence." RP at 998.

a "commonsense" rule that did not make sense when applied:

> [T]he majority's principal reliance is not on precedent but on the "commonsense" rule that "a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." . . . The general rule makes sense, first, when a party who has freely chosen to introduce evidence of a particular fact later sees his opponent's evidence of the same fact erroneously admitted. He suffers no prejudice. See *Mercer* v. *Theriot*, 377 U.S. 152, 154[, 84 S. Ct. 1157, 12 L. Ed. 2d 206] (1964) (*per curiam*); 21 C. Wright & K. Graham, Federal Practice and Procedure §5039, p. 203 (1977). The rule makes sense, second, when the objecting party takes inconsistent positions, first requesting admission and then assigning error to the admission of precisely the same evidence at his opponent's behest. "The party should not be permitted 'to blow hot and cold' in this way." 1 J. Strong, McCormick on Evidence § 55, p. 246, n. 14 (5th ed. 1999).
>
> Neither of these reasons applies when (as here) the defendant has opposed admission of the evidence and introduced it herself only to mitigate its effect in the hands of her adversary.

*Ohler*, 529 U.S. at 761-62 (Souter, J., dissenting).

The dissent focussed on the fact that the trial court's ruling forced the defendant's attorney to raise the issue:

> The point on which the analysis of the cited treatises[6] turns, it should be clear, is not which party first introduces the evidence, but rather which party seeks introduction and which exclusion. A defense lawyer who elicits testimony about prior

---

[6] 1 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 18, at 836 (Peter Tillers ed., rev. ed. 1983) ("[A] party who has made an unsuccessful motion in limine to exclude evidence that he expects the proponent to offer may be able to first offer that same evidence without waiving his claim of error"); 1 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 103.4, at 45-6 (5th ed. 2001) ("However, the party may . . . himself bring out evidence ruled admissible over his objection to minimize its effect without it constituting a waiver of his objection"); 1 McCORMICK ON EVIDENCE § 55, at 246 (John W. Strong ed., 5th ed. 1999) ("[W]hen [a party's] objection is made and overruled, he is entitled to treat this ruling as the 'law of the trial' and to explain or rebut, if he can, the evidence admitted over his protest"); 1 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE § 11, at 65 (1977) ("Having done his best by objecting, the adversary would be indeed ill treated if then he was held to have thrown it all away by doing his best to protect his position by offering evidence of his own.").

convictions on direct examination, having failed in an attempt to have them excluded, is plainly making a defensive use of the convictions; he has no desire to impeach his client. The fact that it is the defense lawyer who first introduces the convictions, then, is irrelevant to the principle the majority invokes.

*Id.* at 763 n.2.

We agree with Justice Souter's analysis. A defense lawyer who introduces preemptive testimony only after losing a battle to exclude it cannot be said to introduce the evidence voluntarily. Waiver is the voluntary relinquishment of a right. *See* BLACK'S LAW DICTIONARY 1574 (7th ed. 1999). Introduction of evidence under these circumstances is not voluntary.

State courts are not bound by the United States Supreme Court interpretation of federal rules of evidence, and other courts have disagreed with the *Ohler* majority on state law grounds. *See, e.g., State v. Daly*, 623 N.W.2d 799 (Iowa 2001) (holding that the waiver was contrary to established precedent in Iowa).

In Washington, case law indicates a tendency to protect the defendant's right to introduce mitigating testimony. In a civil case, the Court of Appeals held that when a litigant against whom evidence of other crimes is ruled admissible seeks to minimize its effect by introducing it himself, he is not precluded from appealing the admissibility. *Garcia v. Providence Med. Ctr.*, 60 Wn. App. 635, 806 P.2d 766 (1991). In *Garcia*, the plaintiff in a medical malpractice action arising from the death of her newborn child sought unsuccessfully to exclude evidence of her prior abortions, and thereafter preemptively testified about the abortions. The Court of Appeals held that she had not waived review: "A party is entitled to try to minimize the adverse effect of a decision by raising the damaging testimony first. Thus, we hold that Garcia has not waived review of the issue by her conduct." *Garcia*, 60 Wn. App. at 641. Later, in a criminal case, the Court of Appeals held that a defendant could not invoke the protections given by *Garcia* because the challenged evidentiary holding did not alter the planned trial

strategy. *State v. Makela*, 66 Wn. App. 164, 171, 831 P.2d 1109 (1992). The inference is that the *Garcia* protections would have been available had the trial strategy been altered in response to the court's ruling. Unlike the defendant in *Makela*, Thang altered his trial strategy in response to the admissibility holding.

## CONCLUSION

Thang has not demonstrated sufficient expectation of privacy in the common areas of the apartment in which he was a guest to suppress the evidence obtained after his hosts consented to a search. However, the court erred in allowing admission of prior bad acts under the identity prong of ER 404(b) after determining that the prior crime was not "signature-like." To hold that Thang's preemptive testimony regarding that crime precluded him from seeking review of the admissibility of the crime would prevent use of a trial tactic long endorsed by Washington courts. We therefore reaffirm our commitment to the principle that a defendant whose motion to suppress such evidence has been denied should not be cast in the untenable position of choosing between his right to mitigate the impact of that evidence and his right to seek appellate review of an erroneous trial court decision. We reverse the trial court and Court of Appeals; Thang is entitled to a new trial.

ALEXANDER, C.J., and SMITH, JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, and OWENS, JJ., concur.