IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Appellant,

    v.

DECHAS DEMPSY BLUE,

                Respondent.

No. 84807-1-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — De'Chas Blue was convicted of one count of robbery in the second degree and one count of theft in the second degree following a jury trial at which evidence of four other robberies was admitted under ER 404(b) for the purpose of proving identity and common plan or scheme. Blue challenges the admission of such evidence and the imposition of a Victim Penalty Assessment (VPA). He also alleges a violation of his right to a speedy trial under CrR 3.3, and submitted a statement of additional grounds with additional claims. Because we hold that the trial court did not abuse its discretion in admitting the ER 404(b) evidence to prove identity, we need not address the other basis under which the court admitted the evidence.[1] We remand to strike the VPA from the judgment and sentence, but otherwise affirm.

---

[1] The State concedes that the ER 404(b) evidence was not admissible to prove a common plan or scheme.

FACTS

On April 9, 2021 Everett Police received report of a robbery of a Safeway Store in Everett. This event is the basis of the theft in the second-degree conviction. The event occurred at approximately 11:15 p.m. Surveillance video showed a tall, heavyset Black man wearing a black hooded jacket with the hood up, black shoes, black pants, and a black face mask.[2] The man approached a Safeway employee to report that another employee had used a racial slur against him and requested to review surveillance footage in order to identify the offending employee. The employee attempted to ask follow up questions. The man told the employee he was asking too many questions and that the interaction was taking too long. The man then demanded money from the till. The man said if the employee did not give him the money there would be trouble. The employee stated the suspect's hand was in his pocket during the robbery and he was unsure if the man had a weapon. The man left the store before police arrived.

Three days later, on April 12, employees at a Renton Safeway reported another robbery at approximately 11:15 p.m. Surveillance video showed a tall, large-figured Black man enter the store wearing a black jacket with the hood up, black pants, black shoes, and a black face mask. Store employees described the man as a heavyset Black male in his thirties who was approximately six feet tall. The man's hands

---

[2] Although not noted by either party, masks were required in stores at the time these robberies took place in 2021 due to COVID-19 restrictions. See In re Recall of Bird, 1 Wn.3d 419, 423, 527 P.3d 1141 (2023) (citing Wash. Sec'y of Health, Ord. 20-03 (Wash. June 24, 2020), https://www.governor.wa.gov/sites/default/files/Secretary_of_Health_Order_2003_Statewide_Face_Coverings.pdf [https://perma.cc/DUV4-92K3]). In fact, surveillance video shows Blue walk past a sign at the store entrance stating "masks required" depicting a face mask.

remained in his front jacket pockets until he approached an employee. At that store, the man asked the store manager to follow him down an aisle, which the manager did. There, the man demanded the manager retrieve cash from the safe and give it to him. The manager walked away and called 911. The manager did note that the man's hands were in his pocket, leading the manager to believe the man may have had a weapon. The man did not receive any money and left the store.

On April 13, employees at a University Place Safeway reported another robbery. This incident occurred at around 12:30 a.m. Video surveillance showed a tall, heavy-set Black man enter the store wearing a black jacket with the hood up, black pants, and black shoes, holding both hands in the front pockets of his jacket. Store employees described the man as African American, tall, and "bigger." The man approached a cashier and told the cashier to give him everything in the till while making comments that the man did not want it to get bad and that the man was from the streets. The man also held one hand in his pocket during the interaction, leading the cashier to believe the man was armed. The investigating officer obtained additional surveillance footage showing the man exit the store, walk toward a nearby apartment complex, then get into an orange Chevrolet Avalanche before driving away.

On April 15, Seattle Safeway employees reported another robbery around 6 a.m. Surveillance video shows a man wearing a white and gray hooded sweatshirt with the hood up, dark pants, black shoes, and a black face mask in the store. The victim described the man as approximately six feet tall with a large build. In the store, the man went behind the counter of a customer service area, where only employees were permitted, then confronted an employee working in an office. The employee asked the

3

man to leave the area before the man told the employee he had a gun and demanded cash. The man kept his left hand in his pocket, leading the employee to believe he had a weapon. The man obtained cash and was followed by employees as he left the store.

On April 21, SeaTac Safeway employees reported a robbery that occurred shortly after the store opened that morning. The suspect was described as a taller, heavy-set African American. The suspect wore a gray jacket, face covering, and khaki pants. The man reportedly waited by the bathroom, then told an employee someone had spit on his wife.[3] The employee went back to the office to review surveillance footage and the man followed him. The employee told the man he needed to wait in the customer area then the man asked where the money was and told the employee if he did not give the man the money, the man would start shooting. The employee told the man they did not have money in the office and walked the man up to the registers, where he told another employee they were being robbed and to give everything in the till to the man.

On May 11, a Safeway in Everett reported a robbery had occurred at 12:44 a.m. This incident is the basis for the robbery in the second-degree conviction. Surveillance video shows a man entering the store wearing a black jacket with the word "SECURITY" written in white letters across the back, with the hood up, wearing dark pants, and black running shoes with white soles, and a face mask. The man held his hands in the front pockets of his jacket as he entered the store. Employees described the man as a tall, stocky Black male wearing a security jacket. The man went up to an employee and asked for cigarettes. The employee rang up the cigarettes while other customers

---

[3] The record on appeal only includes the screen shots from the security video of the April 21 incident, though the security video was admitted at trial.

waited in the cashier's line but the man walked away. The man then returned with additional items. The man asked about the store's opening and closing times and appeared to the employee to be stalling. At some point in his interaction with the employee, the man entered the phone number 206-304-0414 in order to use a Safeway club card. After helping the other customers in line who then left, the employee at the register asked the man if he was going to pay for his items. At that time, the man called over another employee saying he had a problem with the one at the register. When the other employee approached, the man said this is a robbery and ordered the employees to give him all the money and not to do anything stupid or they would "get it."

During his investigation, the assigned detective located a report out of the Lakewood Police Department that associated the phone number 206-304-0414 with Blue's name. Lakewood Police spoke to someone who identified himself as De'Chas Blue and called the department from the number 206-304-0414.

Detectives obtained Department of Licensing photos of Blue and compared it to the surveillance footage from the Safeway robberies. Detectives identified Blue as the suspect in the robberies. A Pierce County Sheriff's Office detective obtained a search warrant for the cell phone number ending in 0414.

Officers tracked the phone to a motel in Kirkland, where they observed Blue exit a room and walk toward an orange Chevrolet Avalanche in the parking lot. Officers found a cell phone in Blue's pocket with the number 206-304-0414. The search history on the cell phone showed that a user searched for "Washington's Most Wanted," as well as conducted searches for "Safeway near me," and "Cricket wireless."

Officers subsequently searched the Avalanche and found a receipt with the name

De'Chas Blue and an EBT[4] card under Blue's name. Detectives subsequently obtained and analyzed the cell phone's location data, which showed Blue's cell phone had been in the vicinity of each Safeway store at the time of each robbery. The data included evidence of the cell phone in the vicinity of a Super K store, where surveillance video and EBT card records show Blue was at approximately 11:20 p.m., just hours before the May 11 robbery of a Safeway three miles away.

Procedural History

The State charged Blue by second amended information with committing theft in the second degree on April 9 and robbery in the second degree on May 11. Because Blue was masked during both events, the State moved to introduce evidence of other bad acts between March and April 2021 to prove identity.[5] The court held a hearing over four days where the State presented live testimony from seven witnesses to support its motion to admit ER 404(b) evidence at trial.

In addition to the reported robberies from April 12, 13, 15 and 21, the State moved to introduce a March 18, 2021 reported theft out of Lakewood Police Department that had been closed and never prosecuted. Sean Ephrem reported to Lakewood Police that he tried to buy an orange Chevrolet Avalanche from someone with the phone number 206-304-0414. Ephrem claimed the would-be seller secretly stole $2,000 cash from Ephrem's wallet during a test drive with his sister and the seller. Ephrem provided photographs of the Avalanche and Blue sitting in the vehicle. During

---

[4] EBT stands for "electronic benefits transfer" card, a type of debit card used to transfer funds to those who receive food assistance.

[5] In its written motion, the State also moved to admit the ER 404(b) evidence to prove motive, intent, absence of mistake or accident, and common scheme or plan. But during oral argument, the State focused mostly on identity and common scheme or plan.

the investigation, a detective received a call from a man who identified himself as De'Chas Blue, who acknowledged meeting with Ephrem, but denied taking any money from him.

Lakewood Police later closed the case after a follow-up investigation.[6]  Neither Ephrem nor his sister testified at the hearing or at trial.  The trial court did not find by a preponderance of the evidence that the alleged March 18 theft occurred and excluded any evidence of the complaint or allegations of the March 18 theft.  However, Blue had identified himself in a call to Lakewood police from the phone number ending in 0414, so the court permitted evidence that Blue and Ephrem had interacted and Blue used that phone number to contact Ephrem.  The parties agreed, and the court required that any reference detectives and the State made during trial as to the source of Blue's phone number would be described as a non-criminal report.  The court excluded any evidence, including photographs, where the source was Ephrem if Ephrem did not testify.

As to the robberies on April 12, 13, 15 and 21, in considering the evidence of those along with the evidence of the charged crimes on April 9 and May 11, the court found that the April 12 event was an attempted robbery and the April 12, 15, and 21 events were robberies

> and taken together with the approximate GPS locations via the phone,
> having the phone being in the geographic vicinity of each of those as well
> as the Court's own observations of the exhibits submitted as surveillance
> footage showing the suspect of the same or substantially similar height
> and build dressed in a very similar way with a hood and a mask who had a
> similar gait holding his arms in the same way proved by a preponderance

---

[6] According to police, Ephrem could not document that he had $2,000 cash.  His sister claimed that she was Ephrem's caretaker, and that the cash was hers to buy the vehicle for her.  The sister did not want to cooperate with the prosecution and hoped that criminal charges would be dropped.

that among all of those incidents that it is the same person. After conducting an ER 404(b) analysis, the court further ruled that the evidence from the robberies on April 12, April 13, April 15, and April 21 were admissible to show identity and common scheme or plan. The court then weighed the probative value against the prejudicial effect. Acknowledging that any relevant evidence is to some degree prejudicial to a defendant simply by virtue of tending to make a fact in a case that would lead to a conclusion of guilt more likely, the trial court found that the evidence is strongly probative of identity and common scheme or plan because of the disguised nature of the suspect. The court further found that there was no inflammatory quality to the evidence and that the court would give a limiting instruction as to the use of the evidence. The limiting instruction stated,

> You have heard evidence concerning misconduct alleged to have been committed by the defendant on dates other than that of the charged incident. Such evidence may only be considered by you to the extent you find it relevant to issues of identity and acting pursuant to a common scheme or plan. It is not to be considered by you for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this instruction.

Blue's case was originally scheduled for trial on July 1, 2022, but the trial court subsequently granted three continuances at the request of the State and defense counsel. The case proceeded to trial on November 14.

During jury deliberations, the jury asked "Where is exhibit 41?" Exhibit 41 was the Lakewood Police Report of the March 18 theft allegation. During trial the report was only referred to as a "non-criminal report" and identified as Exhibit 41 when used to refresh detective Anderson's memory. The court explained that exhibits may have been marked by the court clerk and given a number, but only admitted exhibits are available

to them in the jury room and Exhibit 41 was not admitted into evidence. The court further instructed that if "evidence was not admitted or was stricken from the record, then you are not to consider it in reaching your verdict." The parties agreed with the court's response.

Following a jury trial, Blue was convicted on both counts and sentenced to 29 months' confinement followed by 18 months' community custody. The court imposed a then-mandatory $500 VPA fee.

Blue appeals.

## DISCUSSION

### ER 404(b)

Blue contends that the trial court erred in admitting evidence of four other robberies under ER 404(b).

A trial court's decision to admit evidence of prior bad acts is reviewed for abuse of discretion. State v. Denham, 197 Wn.2d 759, 771, 489 P.3d 1138 (2021). Discretion is abused if it is exercised on untenable grounds or for untenable reasons. State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

"Under ER 404(b) evidence of other crimes, wrongs, or acts is presumptively inadmissible to prove character and show action in conformity therewith." Denham, 197 Wn.2d at 771 (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). Such evidence may be admissible for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). The trial court must evaluate the evidence under a four-part test before it may admit evidence of other crimes or wrongs. Denham, 197 Wn.2d at 771

9

(citing State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995)). The trial court must (1) find that a preponderance of the evidence shows that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant, and (4) find that the probative value of the evidence outweighs its prejudicial effect. Lough, 125 Wn.2d at 852. Blue does not challenge that all the events constituted misconduct but contends that the evidence did not establish that he was the perpetrator.

Evidence is relevant if it makes a fact of consequence more or less probable. Denham, 197 Wn.2d at 771 (citing Powell, 126 Wn.2d at 259). Where the evidence of other bad acts is introduced to show identity through the establishment of a unique modus operandi, it is relevant "only if the method employed in the commission of the crimes is 'so unique' that proof that an accused committed one of the crimes creates a high probability that he also committed the other crimes with which he is charged." Thang, 145 Wn.2d at 643 (quoting State v. Russell, 125 Wn.2d 24, 66-67, 882 P.2d 747 (1994)). The method of committing crimes "must be so unusual and distinctive as to be like a signature." State v. Coe, 101 Wn.2d 772, 777, 684 P.2d 668 (1984). "The greater the distinctiveness, the higher the probability that the defendant committed the crime, and thus the greater the relevance." Thang, 145 Wn.2d at 643 (citing Coe, 101 Wn.2d at 777-78). Relevant factors include "geographic proximity and commission of the crimes within a short time frame" and "wearing similar clothing." Thang, 145 Wn.2d at 643. "Even when features are not individually unique, appearance of several features in the cases to be compared, especially when combined with a lack of dissimilarities, can create sufficient inference that they are not coincidental, thereby justifying the trial

10

court's finding of relevancy." Thang, 145 Wn.2d at 644 (citing State v. Jenkins, 53 Wn. App. 228, 237, 766 P.2d 499 (1989)).

We first address Blue's argument that allowing multiple police agencies to reference the Lakewood Police report as the source of Blue's name and phone number without providing "any innocuous explanation why his name and number would be listed in that special police report" left the jury to "infer Mr. Blue was a criminal-type known because multiple police agencies were hot on his trail for a broad swath of 'bad stuff' around Washington state."

Consistent with the court's ruling, police officers from Seattle, Everett and University Place who investigated the non-charged robberies each referred to the Lakewood report as a "non-criminal" report. Blue agreed to this method of sanitizing any suggestion of criminal activity associated with the report. During trial, Blue did not object at any of the times officers testified consistent with the court's ruling. Thus, any argument that admitting testimony that Blue's name and phone number came from a Lakewood Police non-criminal report is waived. A party may not raise an objection not properly preserved at trial "because trial counsel's failure to object to the error robs the court of the opportunity to correct the error." State v. Henson, 11 Wn. App. 2d 97, 102, 451 P.3d 1127 (2019) (citing State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009)).

We next turn to the admission of the four un-charged robberies. We cannot say the trial court abused its discretion in admitting evidence of four robberies from April 12, 13, 15 and 21 to prove identity.[7]

---

[7] Because we affirm the trial court's admission of the evidence for purposes of identity, we need not address the State's concession that admitting the evidence to prove a common scheme or plan was not proper.

The trial court first explained that it found by a preponderance of the evidence that Blue had committed the robberies on April 9, April 12, April 13, April 15, and April 21, noting that the location of Blue's phone had placed him in the proximity of each store robbed at approximately the time each robbery occurred. It explained that the evidence showing the phone with the number 206-340-0414 was in Blue's possession before and after the robberies indicates that he was in possession of the phone during the robberies, making the location data more accurate. The trial court reviewed the submitted State exhibits of each of the incidents[8] and noted that the suspect was of similar height and build dressed in a similar way who was wearing a hood and mask, and videos showed a similar gait.

The trial court then explained that it was evaluating the evidence for the State's stated purpose of showing identity via modus operandi. The court explained the evidence was relevant for this purpose because of the many shared features of the crimes and the suspect's appearance. The trial court noted that the victim of each robbery was a Safeway store, all robberies occurred within a four-week time period, with two occurring early in the morning and four occurring late at night near the store's opening and closing hours. The trial court explained that in each the suspect wore a mask and a hood pulled low, with both covering most of the suspect's face and the suspect held his hands in the front pocket of his jacket as if holding a weapon. The trial court also noted that the suspect in the April 9 and 21 and May 11 robberies attempted to draw out a manager who would have access to safes or cash boxes by lodging a

---

[8] The State submitted surveillance footage from most incidents and also screen shots of surveillance footage.

complaint that the suspect wished to review or have reviewed on security cameras.[9]  In the April 15 and 21 and May 11 robberies, the suspect entered customer service areas or other storage areas in the back where customers were not permitted to access.  As correctly explained by the court, "each [feature] may not be unusual or distinctive alone but when combined together, they are, so the evidence is clearly relevant to prove identity."  The trial court observed the evidence was particularly relevant because the suspect in each robbery was disguised.

The trial court further weighed the probative value against the prejudicial effect.  The court acknowledged that any relevant evidence is to some degree prejudicial to a defendant simply by virtue of it tending to make a fact in a case that would lead to a conclusion of guilt more likely, but in this case, the evidence is strongly probative of identity because of the disguised nature of the suspect.  Thus, the court found that the prejudicial value is outweighed by the relevance.

Blue argues that admitting evidence of the uncharged crimes was nothing more than introducing bad character evidence suggestive of guilt by a propensity inference.  The main concern with the admission of evidence of other bad acts is the risk of suggesting defendants are guilty because they are a criminal-type person who would be likely to commit the crime charged.  State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (citing Lough, 125 Wn.2d at 859 (1995)).  However, when a trial court scrupulously applies the ER 404(b) analysis, "it effectively prohibits mere propensity evidence."  State v. DeVincentis, 150 W.2d 11, 23-24, 74 P.3d 119 (2003).

---

[9] Although not specifically listed by the court in explaining its reasoning, the events on April 12 and April 13 also shared commonalities.  In the April 12 incident the suspect asked for a manager and in the April 13 incident the suspect confirmed that the employee he was speaking to was the manager.

The trial court held a four-day hearing to consider the proposed ER 404(b) evidence. It found that the State did not meet its burden to prove by a preponderance that the alleged March 18 theft occurred and barred the State from introducing that alleged bad act. The court further meticulously applied the law to the evidence of the uncharged April events and explained its analysis in a detailed, thorough oral ruling.

We conclude that the trial court had tenable grounds and reasons for its decision to admit the evidence to prove identity.

Speedy Trial

Blue claims that the trial court violated his right to a speedy trial under CrR 3.3 when it granted trial continuances without justification on three occasions. CrR 3.3 is distinct from a constitutional speedy trial claim. State v. Denton, 23 Wn. App. 2d 437, 449, 516 P.3d 422 (2022) (citing State v. Rohatsch, 23 Wn. App. 734, 736, 599 P.2d 13 (1979)).

CrR 3.3 requires that a defendant detained in jail shall be brought to trial within 60 days of the date of arraignment. CrR 3.3(b)(1)(i). If a defendant is not brought to trial within that period, the court must dismiss the charges with prejudice if the defendant objects within 10 days after the notice of trial date setting is mailed. State v. Kenyon, 167 Wn.2d 130, 136, 216 P.3d 1024 (2009) (citing CrR 3.3(d)(3), (h)). The purpose underlying this rule is to protect a defendant's constitutional right to a speedy trial. Kenyon, 167 Wn.2d at 136 (citing State v. Mack, 89 Wn.2d 788, 791-92, 567 P.2d 44 (1978)).

However, CrR3.3(e) provides for the exclusion of certain periods when computing the time for speedy trial. Continuances granted by the trial court are

14

excluded from the time for trial.  CrR 3.3(e).  "The decision to grant or deny a continuance rests in the trial court's sound discretion and we will not disturb it on appeal unless there is a clear showing that it is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons."  Denton, 23 Wn. App. 2d at 449 (citing Kenyon, 167 Wn.2d at 135).  CrR 3.3(f)(2) authorizes the trial court to grant a continuance upon the motion of a party when it "is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense."

"It is not a manifest abuse of discretion for a court to grant a continuance under CrR 3.3(h)(2) to allow defense counsel more time to prepare for trial, even over defendant's objection, to ensure effective representation and a fair trial."  State v. Williams, 104 Wn. App. 516, 523, 17 P.3d 648 (2001) (citing State v. Campbell, 103 Wn.2d 1, 15, 691 P.2d 929 (1984)).

On March 4, 2022 defense counsel, over Blue's objection, requested a continuance because he still needed to conduct witness interviews, was not prepared to go to trial, and would not be effective if he were sent out to trial.  The State did not object.  After hearing from Blue, the court granted the continuance for "trial preparations."

On August 26 the State alerted the court that it needed to file a "pretty significant motion" that will have to be litigated in advance of trial.  Defense counsel requested a continuance in order to be fully prepared for trial and accommodate an omnibus hearing.  The court explained to Blue that defense counsel had been working on another one of Blue's cases and was prepared to go to trial on that case but now that

15

case was going to be dismissed because defense counsel needed more time to prepare this case. The court granted the continuance over Blue's objection.

Blue also challenges the trial court granting the State's motion for continuance on June 22. Blue argues that the trial court granted the continuance without requiring the State to provide a reason for the unavailability of four officers.

However, the record suggests that the State may have provided the reasons the officers were not available in a written motion. The prosecutor asserted it had filed a motion for the continuance but had to hand up a copy of that motion to the court during the hearing when the court stated it had no such motion. The record also supports that defense counsel had a copy of the motion and made references to the reasons for the continuances to include "accidents" and "vacations." A copy of that motion is not in the record on appeal.

Scheduled vacations of investigating officers are good cause for a continuance. State v. Torres, 111 Wn. App. 323, 331, 44 P.3d 903 (2002). "This is necessary to preserve the dignity of officers who would otherwise never be able to plan a vacation." Id. When the record is insufficient, it may preclude this court from passing upon the adequacy of the grounds to continue the trial for witness unavailability. Id. at 331-32. In the instant case, the officers' unavailability was not the only basis for the continuance.

The prosecutor appeared at the hearing on crutches and explained she was there against the advice of her doctor because she had recently torn her Achilles. The prosecutor stated she had a potential surgery coming up and would not be available for a couple of weeks. "[U]navailability of counsel may constitute unforeseen or unavoidable circumstances to warrant a trial extension under CrR 3.3([e])(8)." Williams,

104 Wn. App. at 522 (quoting State v. Carson, 128 Wn.2d 805, 814, 912 P.2d 1016 (1996), abrogated on other grounds by State v. Walker, 199 Wn.2d 796, 806, 513 P.3d 111 (2022)).

The court also noted that defense counsel had yet to schedule its CrR 3.6 hearing required to be heard at least two weeks prior to trial. The court observed that even if defense were successful in requesting a motion to shorten time for the CrR 3.6 hearing, that would prove difficult given the prosecutor's injury.

The court granted the State's motion for multiple reasons: unavailability of State witnesses, unavailability of the prosecutor because of her injury and surgery, and the defense counsel's need to note a CrR 3.6 motion.

The trial court continued the trial on tenable grounds and for tenable reasons. Granting the State's request was not manifestly unreasonable.

Victim Penalty Assessment

Blue argues that this court should strike the $500 VPA imposed as a mandatory fee at the time of sentencing.

Under RCW 7.68.035(4), enacted in July 2023, trial courts are required to waive the VPA if the defendant is indigent as defined in RCW 10.01.160(3). This court has applied this waiver to cases pending direct appeal at the time the law went into effect. See State v. Ellis, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023) (citing State v. Ramirez, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018)).

The State acknowledges that because Blue was found indigent at sentencing, the waiver should apply and concedes that this court should remand to strike the VPA. We agree and remand to the trial court to strike the VPA.

Request for New Attorney

In his Statement of Additional Grounds, Blue states that he orally moved for appointment of new counsel at hearings on March 4 and November 10. Blue argues that the trial court should have granted his request on the basis of a lack of communication between himself and his assigned public defender.

A review of the verbatim report of proceedings from March 4 establishes that Blue did not ask for a new attorney at this hearing. He objected to his counsel requesting a continuance and after the court granted the continuance Blue stated, "Probably going to be asking for a new attorney." That was not a request to the court for a new attorney that required a response from the court. However, Blue did request a new attorney on November 10.

When determining whether the trial court erred by refusing to appoint new counsel, we consider "the extent of the conflict, the adequacy of the inquiry, the timeliness of the motion, and the effect of the conflict on the representation actually provided." State v. Thompson, 169 Wn. App. 436, 458, 290 P.3d 996 (2012); see also In re Pers. Restraint of Stenson, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (Stenson II). Upon examining these factors, we will grant relief only if the trial court abused its discretion. State v. Lindsey, 177 Wn. App. 233, 248, 311 P.3d 61 (2013) (citing State v. Cross, 156 Wn.2d 580, 607, 132 P.3d 80 (2006), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018)). An abuse of discretion occurs if the trial court's decision is manifestly unreasonable or based on untenable grounds. Lindsey, 177 Wn. App. at 248-49 (citing State v. Brown, 132 Wn.2d 529, 572, 940 P.2d 546 (1997)). "A decision is based 'on untenable grounds' or made 'for untenable

18

reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting State v. Rundquist, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

A criminal defendant "does not have an absolute Sixth Amendment right to choose any particular advocate." State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004) (quoting State v. Stenson, 132 Wn.2d 668, 733, 940 P.2d 1239 (1997)). A defendant "must show good cause to warrant substitution of [appointed] counsel, such as conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." Id. at 200 (quoting Stenson, 132 Wn.2d at 734). Generally, a defendant's loss of confidence or trust in appointed counsel is not a sufficient reason to appoint new counsel. Id. Attorney-client conflicts justify the grant of a substitution motion only when counsel and defendant are so at odds as to prevent the presentation of an adequate defense. Stenson, 132 Wn.2d at 734 (citing State v. Lopez, 79 Wn. App. 755, 766, 904 P.2d 1179 (1995)). Factors to be considered in a decision to grant or deny a motion to substitute counsel are (1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution on the scheduled proceedings. Id. (citing State v. Stark, 48 Wn. App. 245, 253, 738 P.2d 684 (1987)).

The defendant need not show prejudice, but must demonstrate the alleged conflict caused some lapse in representation contrary to the defendant's interests, or that it likely affected particular aspects of counsel's advocacy on behalf of the defendant. State v. Regan, 143 Wn. App. 419, 428, 177 P.3d 783 (2008). As we recently held in State v. McCabe, 25 Wn. App. 2d 456, 462, 523 P.3d 271

19

(2023), review denied, 530 P.3d 186 (2023), an attorney's failure to work with the defendant must be complete in order to establish that there has been a deprivation of counsel. In the context of a breakdown in communication, this means that the defendant must demonstrate a "complete collapse" in the relationship with counsel; "mere lack of accord" will not suffice. Cross, 156 Wn.2d at 606.

On November 10, four days before trial, Blue requested a new attorney. The court asked Blue to explain why he was requesting a new attorney and Blue responded that he felt his appointed counsel "doesn't like to explain things to me, he doesn't like to communicate things to me." Blue further explained that he had not been shown the evidence, such as video footage and 911 call recordings, that the attorney planned to present in his case. Blue stated that he had only had "real quick, like ten minute[]" visits with his attorney while in detention prior to trial.

Defense counsel explained that there had been a "breakdown in communication" regarding "ultimately, on the theory of the case, it's quite important, and we disagree on that, and there's been a breakdown in communications about how to reconcile that." After defense counsel explained his view of the issue, the court again asked Blue if there was any additional information he believed the court should know about his motion, but Blue stated "[t]he things I said, that should sum up everything."

After hearing both Blue's and his attorney's statements on the matter, the court found that "Mr. Blue is receiving effective representation." The court went on to explain that he was aware that the appointed counsel had effectively represented Blue on a separate case in which Blue prevailed. The court also noted that the attorney had been in another jury trial immediately prior to Blue's scheduled trial, explaining that this was

20

likely the reason for his short visits with Blue before the trial in the instant case. The court explained that it understood that Blue wanted more time with his attorney and that the two had disagreed on the strategy to use at trial, which to the court "means that there has not been a complete breakdown of communication or relationship between the lawyer and client." The court ultimately found that

> [Defense counsel] has acted professionally and vigorously in [Blue's] defense, that he has raised multiple legal issues, that he has been effective and competent in his representation, and that the current state of the relationship between the two of you does not persuade me that your Sixth Amendment rights to counsel are substantially impaired at this time.

The record reflects only a disagreement over the strategy to be used at trial and a desire for additional time spent with his attorney prior to trial.[10] A disagreement of trial strategy does not raise Sixth Amendment concerns. State v. Cross, 156 Wn.2d 580, 609, 132 P.3d 80 (2006), as corrected (Apr. 13, 2006), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018); In re Pers. Restraint of Stenson, 142 Wn.2d 710, 729, 16 P.3d 1 (2001) (fact that attorney and client disagreed over trial strategy not sufficient to find a cognizable conflict). "[T]his is the type of conflict that courts generally leave to the attorney and client to work out, absent actual ineffective assistance of counsel." Cross, 156 Wn.2d at 609. The record does not reflect a "complete collapse" of the relationship between Blue and his counsel and does not show that the breakdown here caused a lapse in representation or affected the appointed counsel's advocacy on behalf of Blue. The trial court did not abuse its discretion in denying Blue's motion for a new attorney.

---

[10] The court encouraged counsel to visit Blue over the upcoming three-day weekend. When counsel explained that the jail said it would not allow professional visits over the three-day weekend, the court said it would sign an order requiring them to provide the visits.

## More Statements of Additional Grounds

Blue asserts that his counsel refused to give him a copy of the discovery because of a fear that doing so would put the victims' safety at risk and that Blue might put "mob hits" on the victims. Blue also summarily complains that his attorney picked an "all white jury" in one hour.

While a defendant may submit a pro se statement of additional grounds for review pursuant to RAP 10.10, our review of such statements is subject to several practical limitations. We consider only issues raised in a statement of additional grounds that adequately inform us of the nature and occurrence of the alleged errors. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). Also, issues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not a statement of additional grounds. See State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Blue's jury claim does not adequately inform us of the nature and occurrence of the alleged errors. For example, it is not clear if the errors relate to whether the jury was drawn from a fair cross section of the community or whether they relate to counsel's conduct in exercising or not exercising challenges or failing to object to the State's exercise of challenges. Moreover, the record does not reflect the race of the seated jurors in Blue's trial or those who were excused. Similarly, Blue's discovery-related assertions depend on facts outside of the record and are more appropriately raised in a personal restraint petition.

## CONCLUSION

We remand to strike the VPA from Blue's judgment and sentence, but otherwise affirm.

WE CONCUR:

_Cohen, J._

_Feldman, J._

_Chung, J._